WOODRUFF CONSTRUCTION COMPANY, Appellee,

v.

Dale MAINS, Appellant.

No. 85–1801.

Supreme Court of Iowa.

May 13, 1987.

R. Todd Gaffney of Duncan, Jones, Riley & Finley, Des Moines, for appellant.

Hayward L. Draper of Nyemaster, Goode, McLaughlin, Emery & O'Brien, P.C., Des Moines, for appellee.

Considered by REYNOLDSON, C.J., and McGIVERIN, LARSON, LAVORATO and NEUMAN, JJ.

LARSON, Justice.

In 1980, Craig West, an employee of Barrick Roofers, Inc., fell through a hole on a roofing project at the Amos Hiatt Junior High School in Des Moines. Woodruff Construction Company was the general contractor and carpenter on the job, and Barrick was the roofing subcontractor. Dale Mains was Craig West's supervisor and the working foreman on the job.

West received workers' compensation benefits from Barrick pursuant to Iowa Code chapter 85. He also brought an action against Woodruff and other defendants. Following discovery, West dismissed the action against all defendants except Woodruff. Woodruff settled with Craig West for $468,496.80 and then filed an action against Barrick and Dale Mains seeking indemnity and contribution. (The indemnity action against Barrick is the subject of the companion appeal, *Woodruff Construction Co. v. Barrick Roofers, Inc.*, 406 N.W.2d 783.)

At trial, the court submitted to the jury special verdict forms which asked the jury to decide whether Dale Mains was grossly negligent, as defined by Iowa Code section 85.20 (1979) and, if so, whether such gross negligence was a proximate cause of Craig West's fall. The court also asked the jury to compare the gross negligence, if any, of Dale Mains to the negligence, if any, of Woodruff. The jury found that Mains was grossly negligent and Woodruff was negligent, attributing Woodruff's negligence as sixty percent of the cause of the fall and Mains' gross negligence as forty percent. Mains moved for a judgment notwithstanding the verdict, which was denied. The court entered judgment against Mains for forty percent of Woodruff's claim, based on the jury's assessment of his relative negligence. Mains appealed, and we now reverse.

Barrick Roofers was hired, as a subcontractor, to tear off the old layer of roofing material on the school building, and to lay a new roof after the underlying deck was repaired by Woodruff. During this procedure, the Barrick crew would often expose decayed areas of the underlying deck called "soft spots," which, when exposed, would not support the weight of a man. When these areas were discovered, workers on the roof were warned of the danger, and Woodruff would trim out the decayed area and replace it with new material.

The evidence is undisputed that, on the day West fell, the Barrick crew exposed a "soft spot" and turned the area over to Woodruff for repair. A short while later, West fell through the hole, sustaining severe and permanent injuries. At the time West fell through the hole to the gymnasium floor, there was no barricade or warning device near the hole.

Although the evidence at trial conflicted regarding Mains' conduct on the job, there was evidence from which the jury could find that Mains was a tough, hard-driving foreman. He was often verbally abusive toward his employees, using obscene language to push his men to work faster. He threatened them with firing, and even with physical abuse, according to some of the evidence. Mains often singled out a certain employee and "rode" him for a whole workday.

Testimony indicates that slips, trips, and falls are frequent on roofing jobs, resulting in an occasional burn from hot tar, but often no injury at all. Witnesses for the plaintiff attributed many minor accidents to the pressure exerted by Mains which they claim resulted in inattentiveness. A Barrick employee, James Henderson, testi-

fied that Mains would push a worker to the point that the worker would not notice things. When asked why he did not notice the hole in question, Henderson replied, "I wasn't paid to look for stuff like that. I was paid to work." Mains, on the other hand, testified that tripping accidents occur because of a heavy accumulation of tar and gravel on the bottom of the worker's shoes, making it difficult to walk.

Over the years, two other Barrick employees had been injured in falls. One employee was injured when he fell onto a truck after getting tangled up with a wheelbarrow, and another employee was injured when he raised a piece of plywood covering an exposed hole and backed directly into the hole. Testimony was inconclusive, however, as to whether Mains was the foreman at the job site of these accidents.

On the day in question, Barrick employees had uncovered a soft spot, and Woodruff was summoned to make the necessary repairs before Barrick reroofed the area. Mains then assigned West to a task on the edge of the building, and Mains commenced work sixty to eighty feet away from West with the exposed hole between them. Shortly thereafter, Mains ordered West to report to him. Plaintiff's witnesses claim Mains used profanity, telling West to "get his f——ing rear end over here and I mean now." Mains, on the other hand, says he told West to get his "fanny over here with the rest of the boys." In any event, West complied with Mains' order and proceeded toward Mains. En route, he walked into the hole.

The evidence indicates that West had in fact helped remove the area of old roofing which exposed the fateful hole. In addition, at least twenty-five similar soft spots had been exposed and repaired on the particular job site prior to the accident.

Mains raises three issues: (1) whether the trial court erred in failing to sustain his motions for directed verdict and for judgment notwithstanding the verdict; (2) whether there was sufficient evidence that his conduct was the proximate cause of West's injuries; and (3) whether the trial court erred in failing to consider the negligence, if any, of Craig West. We will address the first issue only; because we hold that Mains' motions should have been sustained, the last two issues are moot.

The primary argument made by Mains is that the evidence was insufficient to establish he was grossly negligent. Woodruff disagrees and, in a nutshell, argues that it was reasonable for the jury to infer from the evidence that the level of inattention caused by Dale Mains' riding of Craig West that day was so high that Craig West was not even looking where he was putting his feet.

■ A directed verdict or judgment notwithstanding the verdict is appropriate if there is no substantial evidence in support of each element of the plaintiff's claim. *Valadez v. City of Des Moines*, 324 N.W.2d 475, 477–78 (Iowa 1982). Mains concentrates his argument on the question of gross negligence, arguing there was insufficient evidence to submit that question to the jury.

Iowa Code section 85.20 provides a unique variation on gross negligence in suits against co-employees. That section provides, in relevant part, that workers' compensation is the exclusive remedy available to an employee, thus precluding suits against a co-employee, "provided that such injury ... is not caused by the other employee's *gross negligence amounting to such lack of care as to amount to wanton neglect for the safety of another*." Iowa Code § 85.20 (1979) (emphasis added).

■ The elements necessary to establish gross negligence under this section were enunciated in *Thompson v. Bohlken*, 312 N.W.2d 501, 505 (Iowa 1981): (1) knowledge of the peril to be apprehended; (2) knowledge that injury is a probable as opposed to a possible result of the danger; and (3) a conscious failure to avoid the peril.

As we pointed out in *Thompson*, the scope of a claim against a co-employee is severely restricted, particularly by adding the requirement of wantonness in defining

gross negligence. As Prosser has pointed out

> [t]he usual meaning assigned to "willful," "wanton" or "reckless," according to taste as to the word used, is that the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly *probable* that harm would follow.

W. Prosser, *Law of Torts* § 34, at 185 (4th ed. 1971) (emphasis added).

The Restatement of Torts labels both "wanton" and "willful" misconduct as "reckless disregard for the safety of another." It distinguishes this type of misconduct from intentional misconduct only in that the former a strong probability of harm is required while in the case of intentional misconduct, substantial certainty of harm is required. Restatement (Second) of Torts § 500(f), at 590 (1965).

In an early Iowa case, *Siesseger v. Puth*, 213 Iowa 164, 239 N.W. 46 (1931), we illustrated the concept of wantonness by comparing the throwing of an object with the intent to strike a person on one hand, and on the other, throwing it without such intent, but in fact believing that it will in fact strike another then proceeding with indifference as to whether it does or not. The latter is wanton conduct. *Id.* at 172, 239 N.W. at 50.

Woodruff recognizes that gross negligence is a stringent standard and that this court failed to find it in both *Thompson* and *Taylor v. Peck*, 382 N.W.2d 123 (Iowa 1986). Woodruff relies, however, on *Larson v. Massey-Ferguson, Inc.*, 328 N.W.2d 343 (Iowa Ct.App.1982), where a foreman told employees to put weight on an auger which placed plaintiff twelve to eighteen inches from an unshielded power take-off shaft. The plaintiff's jacket became entangled in the machine, causing injury. The court of appeals found substantial evidence to support the trial court's judgment of gross negligence, explaining its holding in this manner:

> Defendant knew his order required plaintiff to work in close proximity to the unshielded PTO shaft and that injury was probable whenever working near unshielded moving parts. This is evident in that defendant warned his crew to stay clear of the moving portions of the PTO. Despite the obvious danger associated with an unshielded PTO shaft, defendant instructed his crew to put weight on the auger. . . .

*Larson*, 328 N.W.2d at 346.

Woodruff likens the present case to *Larson*, arguing that Mains consciously disregarded the obvious peril by ordering a distracted Craig West to come over to him quickly when the hole was in a straight-line path between them. Reliance on *Larson*, however, is tenuous. There, the foreman was obviously aware of the danger an uncovered operating PTO shaft possesses, yet he disregarded the peril and ordered the employees to get dangerously close.

When we apply the test of section 85.20 as interpreted in *Thompson* and its progeny, we believe that there was not sufficient evidence to submit the issue of gross negligence. As is illustrated by the attached Defendant's Exhibit A, there was a considerable distance between the soft spot and the edge of the roof, which would readily have permitted West to get to Mains without walking over the soft spot. (The soft spot is shown in the larger circle on Exhibit A.) Testimony established that the soft spot was approximately two feet by four feet and the distance between the soft spot and the edge of the roof was from ten to fifteen feet.

It cannot be said that, even in the light most favorable to the plaintiff, the evidence shows a "probability" that West would in fact fall through the hole. Comparing it to the analogy in the *Siesseger* case, we do not believe Mains' act indicated a belief that West in fact would fall. While Mains' abusive activities in regard to his employees could well be found to amount to negligence, in view of the hazardous condi-

tions present on the roof, we do not believe that the requisite showing of probability of injury required by section 85.20 was established.

Accordingly, we reverse and remand for entry of an order dismissing the petition.

REVERSED AND REMANDED.

EXHIBIT A