William E. SWANSON, Sr., Appellant,

v.

Robin McGRAW and Phillip Reynolds, Appellees.

No. 88–859.

Supreme Court of Iowa.

Oct. 18, 1989.

Thomas H. Preacher, Davenport, for appellant.

Richard M. McMahon and Vicki L. Seeck of Betty, Neuman & McMahon, Davenport, for appellees.

LAVORATO, Justice.

The plaintiff, William E. Swanson, Sr., sued two fellow employees, alleging gross negligence under Iowa Code section 85.-20(2) (1983). After the close of Swanson's evidence, the district court directed a jury verdict in favor of the two defendants. We reverse and remand.

Swanson was an employee of the Oscar Mayer Foods Corporation in Davenport. On the night of January 7, 1985, Swanson suffered a work-related injury when caustic soap he was using to clean some machinery leaked through a hole in his protective rain suit. As a result of the leak, Swanson received a third-degree chemical burn on his right leg.

At the time, Swanson worked in the sanitation department, a position he had held for thirteen years. His shift was from 8 p.m. to 4 a.m. On this night Swanson's job was to clean the "CWP (continuous wiener processing) Smoke Zone," a room through which wieners are mechanically conveyed for cooking and smoking. Swanson had been responsible for cleaning this room for about four months. At the time of his transfer to this job, Swanson received about three days' training.

Swanson's duties included spraying the equipment, walls, and cabinets in the room with a soap solution that contained highly caustic chemicals such as lye. Swanson applied this solution with a power spray machine called a "saniseptor" and then rinsed the soap off with water.

The soap came in a powder form which had to be mixed just prior to its application. The barrels containing the soap powder had labels warning that the soap was caustic. It was common knowledge among all employees working in the sanitation department that the soap contained chemicals that could cause severe chemical burns. In fact several employees had been burned while cleaning the CWP room.

To protect employees working with this soap, the company required them to wear rubber boots, rubber gloves, a rubber apron, protective goggles, and "poly sheets" (sheets of long plastic) over the

arms and legs. The employees secured the poly sheets to their bodies with either masking tape or rubber bands.

As an added precaution, the employees wore rain suits. The company furnished, at its expense, all of this gear except the rubber apron.

On the night of his injury Swanson was wearing a T-shirt, cotton pants, rubber boots, poly sheets on his arms and legs, and his rain suit. He wore two pairs of gloves: a cotton set with a rubber set underneath. To protect his face and head, Swanson wore a shield similar to a welder's mask.

Swanson used masking tape instead of rubber bands to secure the poly sheets on his legs because the rubber bands cut off the circulation. The poly sheets covering his legs often fell down because of the intense heat and the movement required to reach all the equipment. Other employees had the same experience with the poly sheets; so this was common knowledge among them.

Swanson did not wear the rubber apron while he was applying the soap because the apron restricted his movement and might cause him to trip and fall. During this part of the cleaning operation Swanson was at times on a ladder and at other times climbing the equipment to clean it. Swanson did use the apron while rinsing the soap off the equipment.

On January 2, several days before his accident, Swanson told his immediate supervisor, Robin McGraw, that there was a hole in his rain suit. McGraw told Swanson there were no other rain suits available and that he would order some. McGraw also told Swanson to protect himself "the best he could."

On the night of his injury just before his shift began, Swanson reminded McGraw of the hole and asked if the new rain suits had arrived. McGraw told Swanson that the rain suits were on order and that he would get one to Swanson as soon as they arrived. This conversation took place in the presence of Phillip Reynolds, the night plant manager. Both McGraw and Reynolds then told Swanson to take care of himself. Swanson never refused to continue working because he was afraid of being suspended.

Although Swanson did not know the exact spot of the hole, he knew it existed because his pants had gotten wet before he was injured. This was the same spot where Swanson suffered his injury.

On the night of his injury, Swanson had completed soaping the CWP room and was preparing to rinse the room when he felt a warmth on his leg. He left the room immediately and told McGraw of the burn. After seeing the burn, McGraw sent Swanson to the hospital.

As a result of the burn, Swanson underwent several skin graft operations. He remained home for approximately two months and received workers' compensation benefits.

Later Swanson filed an action with the industrial commissioner, seeking permanent partial disability. He also filed a products liability action in federal court against the soap manufacturer, and this action against McGraw and Reynolds. The industrial commissioner has already determined that Swanson is not entitled to permanent partial disability. The products liability action was ongoing when the action here was tried.

In this action against McGraw and Reynolds, Swanson alleged that their failure to provide him with a new rain suit amounted to gross negligence as that term is defined in Iowa Code section 85.20(2). The case was tried to a jury. At the close of Swanson's evidence, the district court sustained the defendants' motion for a directed verdict. In granting the motion, the court found that there was no substantial evidence that the defendants knew the injury was probable or that they consciously failed to avoid the peril. Swanson appealed, contending the district court erred when it sustained the motion for directed verdict.

In ruling on a motion for directed verdict the district court must first determine whether the plaintiff has presented substantial evidence on each element of the

claim. *Kurth v. Van Horn,* 380 N.W.2d 693, 695 (Iowa 1986). Evidence is substantial if a jury could reasonably infer from it these elements. *Schumacher v. McDonald,* 320 N.W.2d 640, 642 (Iowa App. 1982). If the evidence is not substantial, a directed verdict is appropriate. *Kurth,* 380 N.W.2d at 695.

Under the substantial evidence standard, if reasonable minds could differ on an issue in light of the evidence presented, the court must submit the issue to the jury. *Id.* In addition, even when the facts are not in dispute or contradicted, if reasonable minds might draw different inferences from them a jury question is engendered. Iowa R.App.P. 14(f)(17). When considering a motion for directed verdict, we consider the evidence in the light most favorable to the party against whom the motion is directed. *Kurth,* 380 N.W.2d at 695.

█ Iowa Code section 85.20(2) permits employees to recover against coemployees for "gross negligence amounting to such lack of care as to amount to wanton neglect for the safety of another." Iowa Code § 85.20(2). We approved the following definition of wanton conduct in *Thompson v. Bohlken:*

"[W]anton" conduct lies somewhere between the mere unreasonable risk of harm in ordinary negligence and intent to harm. . . .

"The usual meaning assigned to 'willful,' 'wanton' or 'reckless,' according to taste as to the word used, is that the actor has intentionally done an act of an unreasonable character in disregard of a risk known to or so obvious that he must be taken to have been aware of it, and so great as to make it highly *probable* that harm would follow."

312 N.W.2d 501, 504–05 (Iowa 1981) (quoting W. Prosser, *Handbook of the Law of Torts* § 34, at 183–84). We then said these elements are necessary to establish gross negligence under section 85.20(2):

1. Knowledge of the peril to be apprehended;

2. Knowledge that injury is a probable, as opposed to a possible, result of the danger; and

3. A conscious failure to avoid the peril.

*Thompson,* 312 N.W.2d at 505.

The question whether there was substantial evidence of gross negligence under section 85.20(2) has been considered in six cases: *Eister v. Hahn,* 420 N.W.2d 443 (Iowa 1988); *Woodruff Constr. Co. v. Mains,* 406 N.W.2d 787 (Iowa 1987); *Justus v. Anderson,* 400 N.W.2d 66 (Iowa App.1986); *Taylor v. Peck,* 382 N.W.2d 123 (Iowa 1986); *Larson v. Massey–Ferguson, Inc.,* 328 N.W.2d 343 (Iowa App.1982); *Thompson,* 312 N.W.2d 501 (Iowa 1981). In only one—*Larson v. Massey–Ferguson, Inc.*—was the decision favorable to the plaintiff. This underscores how difficult it is to prove a case of gross negligence under section 85.20(2) as we have interpreted it. Yet, for reasons that follow, we think this is one of those cases in which the plaintiff did produce substantial evidence on all three elements.

Those cases in which the appellate decision was against the plaintiff, the focus of each opinion was on the second element—knowledge that the injury was probable. In *Eister,* the plaintiff was injured when his left leg was caught in a combine. Just before the accident, the coemployee-defendant had disengaged the clutch between the combine and the cornhead but had not shut off the combine engine. When the plaintiff attempted to clean some cornstalks from the cornhead, the clutch was somehow reengaged and the plaintiff's leg became entangled in the machine. We found there was no evidence the defendant was aware that an accident was likely to occur. We likewise found that the plaintiff moved into the danger zone without being requested to do so. *Eister,* 420 N.W.2d at 446.

In *Woodruff* the plaintiff-employee, a roofer, fell through a hole in a roof that his crew was responsible for repairing. The crew was warned of the hole before the plaintiff fell. The defendant-coemployee ordered the plaintiff to come to him. As he was responding to this order, the plaintiff fell through the hole. The plaintiff took a direct route to the defendant that led him

to the hole. There was about ten to fifteen feet between the hole and the edge of the roof. We found this distance made it less than probable that the plaintiff would in fact fall through the hole. *Woodruff,* 406 N.W.2d at 790.

In *Taylor* the plaintiff severely injured her right hand while operating a punch press. The press was set up with a die to punch out metal forms. The press had a set of two palm buttons; the operator had to depress both before the press would run. In addition to holding down the two palm buttons, the operator had to watch the metal parts coming out of the press to make sure they were being ejected properly. At the time of the plaintiff's injury, the left palm button was weighted down with a block of steel to keep it continuously depressed. This permitted the press to begin operating when only the right palm button was depressed. A die pin in the press had been periodically working loose. When the plaintiff reached up into the die to check the die pin, the right palm button was somehow activated. This caused the press to start up and injure the plaintiff.

Several facts in *Taylor* led us to conclude there was not substantial evidence that this injury was probable as opposed to possible. There had been no previous accidents on this particular press. There were no safety inspections that would have alerted the defendant about any malfunction in the press. There was no evidence that the defendant knew the left palm button was weighted down. And the defendant did not instruct the plaintiff to put her hand into the die. *Taylor,* 382 N.W.2d at 127–28.

*Taylor* was similar in facts to our first case on gross negligence under section 85.-20(2)—*Thompson v. Bohlken.* In *Thompson* the plaintiff was also operating a press. While doing so he lost the fingers of his left hand. Although several employees had been injured while working with other presses, none had been injured under similar circumstances, or on this press. And no safety inspections had put the defendant on notice of any defect in the press. So we found that the defendant-coemployee—the plant manager—was not

aware by observation or experience that the plaintiff's injury would probably result from the questionable practices that the plaintiff claimed constituted gross negligence. *Thompson,* 312 N.W.2d at 505–06.

The other two appellate cases on the substantial evidence issue—*Justus v. Anderson* and *Larson v. Massey–Ferguson, Inc.*—were decided by the court of appeals. In *Justus* the plaintiff was injured when boxes of paper products fell on him. The defendant-coemployee had redesigned the warehouse in which the plaintiff was injured. Under the defendant's plan, paper products were stacked four pallets high. During the period of redesign the defendant saw stacks leaning and tilting and knew that a four-high stack of paper products was more likely to tilt than a three-high stack. He also knew that if a stack leaned far enough without something supporting it, the stack would fall and possibly injure employees in the immediate area. In concluding the evidence was not substantial on the probability issue, the court relied heavily on several factors we found significant in *Taylor* and *Thompson.* For example, no other accidents had occurred under similar circumstances, and the defendant had not been placed on notice by safety inspections that injury was probable. *Justus,* 400 N.W.2d at 68.

In *Larson,* the court of appeals did conclude there was substantial evidence on all three elements of gross negligence. The plaintiff was part of a crew installing a fence with a posthole digger. The digger was essentially a vertical auger, operated by mechanical power transferred through a rotating power take-off (PTO) shaft on the rear of a tractor. The defendant—the plaintiff's immediate supervisor—instructed the crew to "put weight" on the auger so that it would penetrate the hard ground. The plaintiff was injured when he put his weight on the front part of the auger. His jacket became caught in the PTO shaft. The spinning motion of the shaft pulled him into the turning auger.

On the issue whether there was substantial evidence that injury was probable, the court of appeals found several facts signifi-

cant. First, the evidence was uncontroverted that the defendant knew the unshielded PTO shaft was dangerous. Second, he knew that his order required the plaintiff to work in close proximity to the unshielded PTO shaft and that injury was probable whenever one worked near unshielded moving parts. Last, the defendant warned the crew to stay clear of the moving parts of the PTO shaft, a fact that established he knew the injury was probable. *Larson*, 328 N.W.2d at 346.

■ After carefully considering the factual scenarios in these six cases, we are convinced the facts here are more in line with *Larson* than with the other five cases. Swanson was working with a soap that contained highly caustic chemicals such as lye. These chemicals could cause severe chemical burns. The containers for the soap had labels warning that the soap was caustic. Other employees in the past had been burned. The company recognized the dangerous qualities of the soap because they furnished protective gear to employees who used it. So it was obvious to the defendants that the soap was dangerous.

The defendants also knew injury was probable to Swanson. Several facts bear this out. First, Swanson told the defendants, not once, but twice of the tear. They acknowledged the probability of injury when they told him to protect himself the best way he could. Such an acknowledgment also served, in effect, as an order to continue working.

Second, the poly sheets did not adequately protect the area of the body where Swanson was burned. More often than not the sheets would slide down to the ankles. This was common knowledge among personnel doing cleanup work. Viewing the evidence in the light most favorable to Swanson, we think the jury could reasonably infer that the defendants with their experience would know this.

Last, the probability that an injury would occur increased each day Swanson was required to work in this dangerous condition. This truly was an accident waiting to happen. Swanson said he knew he had a leak in his rain suit because his pants had gotten wet. The jury could reasonably infer the defendants knew this too. It seems reasonable to us then that it was only a matter of time before the soap would reach his skin. Observation, experience, and common sense should have told these defendants that the longer the dangerous situation persisted, the chance of injury passed from the realm of possibility to the realm of probability. We think the jury should have been allowed to determine whether the realm of probability had been reached.

In spite of this obviously dangerous situation, the defendants told Swanson to continue working with the defective rain suit until the new ones arrived. They simply put their minds to the existence of a danger to Swanson and failed to take precautions to avoid that danger other than to tell him to protect himself the best he could. So in our view there was substantial evidence that the defendants consciously disregarded the obvious peril in expecting Swanson to continue working under these conditions.

We conclude the district court erred when it directed a verdict in favor of the defendants because there was substantial evidence on all three elements of gross negligence. We therefore reverse and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

All Justices concur except SCHULTZ, J., joined by McGIVERIN, C.J., and LARSON, J., who dissent.

NEUMAN, J., takes no part.

SCHULTZ, Justice (dissenting).

I do not believe there is sufficient information in the record to make a factual issue that defendants had knowledge that an injury to plaintiff was probable. Although plaintiff twice complained of a hole in his rain suit, he did not tell defendants that the liquid had penetrated the next line of protection, his poly sheets, and made his pants wet. The majority conclusion that the jury could reasonably infer that defen-

dants knew plaintiff's pants had gotten wet is unwarranted. There is nothing in the record that could provide that inference. Such a finding could only come from speculation.

I would affirm the trial court.