**KANSAS CITY LIFE INSURANCE COMPANY, Appellant,**

v.

**Randy HULLINGER, Appellee.**

No. 88–1898.

Court of Appeals of Iowa.

May 24, 1990.

James M. Holcomb and Robert A. Sims of Bradshaw, Fowler, Proctor & Fairgrave, Des Moines, for plaintiff-appellant.

William L. Shelton and Richard L. Ambelang of Shelton Law Firm, Chariton, and A.V. Hass, Chariton, for defendant-appellee.

Heard by OXBERGER, C.J., and DONIELSON and SACKETT, JJ.

OXBERGER, Chief Judge.

Kansas City Life appeals from a district court judgment awarding Randy Hullinger $28,000 compensatory and $57,000 punitive damages for Kansas City Life's interference with the existing and prospective contractual relationship of Hullinger and rejecting Kansas City Life's action seeking ejectment of Hullinger from the farm. The district court ruled in a post-trial order that the maximum compensatory award the jury could award was $25,632. Kansas City Life contends that the district court erred in: (1) determining that Hullinger was entitled to possession of the farm in 1987; (2) determining that Kansas City Life intentionally interfered with Hullinger's prospective business relations; (3) determining that the compensatory damage award was supported by the evidence; and (4) determining that punitive damages were properly awarded. Our scope of review is for correction of errors at law. Iowa R.App.P. 4. We affirm in part and reverse in part.

In 1984, Kansas City Life initiated foreclosure proceedings against the Snooks concerning their farm. National Bank had a junior mortgage on the property and initiated their own foreclosure suit. A decree of foreclosure was entered in Kansas City Life's case in April 1985. The sheriff's sale was held in April 1986 and Kansas City Life was the successful bidder.

In May 1986, the receiver appointed in National Bank's case entered into a lease for the farm with the Snooks. The Snooks leased the farm to the Lukane Corporation and they leased the farm to Hullinger on May 15, 1986. Prior to September 1, 1986, John Snook was served a notice of termination on the farm lease by the receiver. Hullinger was not notified.

In April 1987, Kansas City Life claimed possession of the farm as owner following the redemption period. Kansas City Life made arrangements to rent the farm during 1987. However, Hullinger was farming the land.

Later in 1987, Kansas City Life filed a forcible entry and detainer action against Hullinger. However, the district court determined that the forcible entry and detainer action was not the proper action. Meanwhile, Hullinger was unable to apply for

government aid through the local Agricultural Stabilization and Conservation Service (ASCS) office since Kansas City Life claimed a superior interest in the farm.

In October 1987, Kansas City Life filed this action for ejectment of Hullinger. Hullinger counterclaimed for compensatory and punitive damages based on Kansas City Life's actions preventing Hullinger from signing up for a crop program through the ASCS office. Hullinger claimed that this resulted in his receiving significantly less money for his corn.

Prior to submitting the case to the jury, the district court dismissed the ejectment action, determining that Hullinger was properly in possession of the farm in 1987. The jury then returned a verdict for Hullinger on his claims, awarding him $28,000 compensatory and $57,000 punitive damages. The district court later reduced the compensatory award to $25,632. Kansas City Life has filed this appeal.

### I. *Possession of Farm Property*

First, Kansas City Life contends that the district court erred in determining that Hullinger was entitled to possession of the farm in 1987. Kansas City Life asserts that the filing of the foreclosure petition and its subsequent indexing in the lis pendens index provided Hullinger with constructive notice of the foreclosure.

Hullinger argues that the lis pendens doctrine does not apply since Kansas City Life had received its foreclosure decree on April 5, 1985. He contends since Kansas City Life's foreclosure decree preceded his lease he entered into with the receiver on May 2, 1986, there was nothing pendente lite.

The lis pendens provisions of Iowa Code section 617.11 provide:

When so indexed said action shall be considered pending so as to charge all third persons with notice of its pendency, and while pending no interest can be acquired by third persons in the subject matter thereof as against the plaintiff's rights.

Hullinger's leasehold interest originated from the receiver appointed in the National Bank and Trust foreclosure. The Iowa district court appointed Don Russell as receiver in the foreclosure action between National Bank and Trust and John Snook on September 23, 1985. The receiver was appointed by the court in the foreclosure action pursuant to Iowa Code section 680.1 (1989) which provides:

On the petition of either party to a civil action or proceeding, wherein the party shows that the party has a probable right to, or interest in, any property which is the subject of the controversy, and that such property, or its rents or profits, are in danger of being lost or materially injured or impaired, and on such notice to the adverse party as the court shall prescribe, the court, if satisfied that the interest of one or both parties will be thereby promoted, and the substantial rights of neither unduly infringed, *may appoint a receiver to take charge of and control such property under its direction during the pendency of the action,* and may order and coerce the delivery of it to the receiver. (Emphasis added.)

In the foreclosure decree dated April 5, 1985, Kansas City Life Insurance Company was given the right to appoint a receiver. Mr. William Schalekamp, attorney for Kansas City Life in their investment department, wrote on the decree the following addendum to paragraph IX:

Plaintiff [Kansas City Life] shall not request appointment of a receiver prior to December 1, 1985; plaintiff shall be entitled to appointment of a receiver, in its sole discretion, at any time after December 1, 1985 and the Snook defendants have waived any right to object to such appointment of a receiver; and the court may appoint a receiver at any time after December 1, 1985, upon application of plaintiff without notice to or approval of any defendant.

Mr. Schalekamp testified as follows:

Q. So while you say you were entirely satisfied with the status of the decree and the National Bank and Trust Company case, you still had an interest in the receivership in your case, did you not?

A. Number one, from our perspective, we wanted to preserve that right. The other receivership could have been closed but this, as I recall, was inserted—Concerns that the Snooks had, not Kansas City Life.

Q. Well, that handwritten language in substance says that you're delaying your right to seek the appointment of a receiver and wouldn't make any effort to do that until after what? December 1, 1985? A. Yes. That is generally what it provides.

Q. And then, after that date, if you wanted to have a receiver appointed it would not be resisted by Snooks? A. That is the terms of the decree. Yes.

Q. Now did you ever—Did Kansas City Life ever make any effort to implement that language by seeking the appointment of a receiver after December 1, 1985? A. Well, I think that concluded that we wanted a receiver and I don't agree with your conclusion and your question. The answer is no. We never did seek a receiver in this action—in the action, the foreclosure action, with the Snooks.

Q. In not doing that, were you still satisfied with the receivership that existed in the National Bank and Trust Company case then? A. At that time. Yes.

Q. All right. And did that ever change? A. Yes.

Q. Did you become dissatisfied with that receivership at some time? A. Yes, we did.

Q. When was that? A. At the time it was closed.

Q. But during the interim, between the date that Mr. Russell was appointed as a receiver in the National Bank and Trust Company case which was in September of 1985 and until the time he was discharged in approximately July of 1987, you were content with that receivership? A. With the legal status of it. I wasn't content with everything that he did.

On April 25, 1986, the district court entered an order regarding John Snook's application for review of the receivership in the foreclosure proceedings with National Bank and Trust. The district court's order rescheduled and continued the review hearing to approve a lease from the receiver to Snook "for a period not to exceed two weeks in order to allow Kansas City Life the opportunity to be. heard." The district court's order stated: "[T]hat at the time of the rescheduled hearing, that this court shall receive arguments as to whether the 816 acres of property in this receivership which was recently sold in a sheriff's sale to Kansas City Life should properly be removed from the receivership."

The rescheduled hearing was held on May 2, 1986. At the hearing the district court approved of the lease from the receiver to John Snook. Snook also leased the farm to Lukane Corporation on May 2, 1986, pursuant to a provision in the lease. Thereafter, Lukane Corporation leased the property to Hullinger on May 15, 1986. This lease was recorded on July 16, 1986, in the Wayne County Courthouse.

The district court noted that Kansas City Life had the right to have a receiver appointed in the foreclosure action. The court further stated:

The lease which Mr. Hullinger had in 1986 was authorized by the Iowa District Court in this county. It was done with the awareness of Kansas City Life. Kansas City Life was not, so far as this record shows, a party to the National Bank and Trust forfeiture but they were aware of it and there was testimony that they were satisfied with the appointment of a receiver in that case. They were aware of it to the point that they resisted the consolidation of that case with this case. So I don't think that there is any question but what the lease was an authorized bona fide lease and there isn't any evidence to the contrary. I don't know that Kansas City Life's awareness of the receivership necessarily made them aware of this particular lease; that is, the lease from the receiver to John Snook. But they certainly know what happens in receiverships and they know that the receiver would be doing something with the real estate to promote

income and they were aware of the action and they could well have determined what happened as far as any actions taken by the receiver. There wasn't anything concealed that I can see as far as Mr. Hullinger's tenancy.

We agree with the analysis of the district court. As previously noted, National Bank and Trust had a junior mortgage on the property in question and was included as a defendant in Kansas City Life's foreclosure action. Kansas City Life resisted its foreclosure action being joined with the National Bank and Trust foreclosure. Kansas City Life was satisfied with the receivership in the National Bank and Trust foreclosure action and made no objections to the receiver's appointment. Kansas City Life was satisfied and content with the receiver's action "to take charge of and control" of the property in question. In effect Kansas City Life ratified the actions of the receiver appointed by the district court. Consequently, we do not believe the foreclosure proceedings terminated Hullinger's right to possession of the property in 1987.

Kansas City Life further claims that Hullinger's rights were terminated by the effective service of notice of termination on John Snook. The receiver served John Snook with a written notice of termination of the lease on August 15, 1986.

Hullinger testified that he was first made aware that Kansas City Life claimed possession of the property on June 15, 1987, when Mr. Russell Roy, assistant vice-president, Director of Mortgages, and Mr. Schalekamp visited the property. Hullinger contends that as a farm tenant Kansas City Life was required to serve him notice of the termination of the farm tenancy pursuant to Iowa Code section 562.6 (1989).

Iowa Code section 562.6 provides:

In the case of farm tenants, except mere croppers, occupying and cultivating an acreage of forty acres or more, the tenancy shall continue beyond the agreed term for the following crop year and otherwise upon the same terms and conditions as the original lease unless written notice for termination is served upon either party or a successor of the party in the manner provided in § 562.7, whereupon the tenancy shall terminate March 1 following.

In Iowa there is well established public policy "in favor of the security of farm tenancies." *Ganzer v. Pfab*, 360 N.W.2d 754, 756 (Iowa 1985). The Iowa legislature incorporated this public policy in special provisions regarding the termination of farm tenancies in chapter 562 of the Iowa Code. *Id.* These statutes were enacted for the benefit of the tenant and are aimed at security of tenure. *Id.* Our duty is to construe these statutes liberally. *Id.*

At the conclusion of the evidence and out of the presence of the jury, the district court ruled that, because the property had been subleased first to Lukane Corporation and then subleased to Randy Hullinger, Randy Hullinger was a valid tenant who had acquired rights in the property. The district court further concluded as a matter of law that Hullinger was entitled to notice of the termination of the farm tenancy. The district court determined that since Hullinger did not receive notice of the termination of the farm tenancy he was entitled to possession of the property in 1987. The district court stated:

[T]he case law certainly expresses a very strong indication by the Iowa Court that farm tenants are going to be afforded a great deal of protection under the Iowa law.... In the [sic] case ... the forfeiture was not initiated until after the time for notice in that particular crop year had passed. Therefore, there was no opportunity to give notice. Nevertheless, the Supreme Court has said that that tenant is entitled to notice from somebody and he didn't get it and therefore his rights really were superior to that of the forfeiting vendor. In this particular case it illustrates, I think, that the right to possession didn't come about until after the date had passed. The foreclosure action was—As I recall, the foreclosure action was initiated prior to the time for notice in 1986. The right of possession of Kansas City Life didn't

come about until after, after that time had passed. As I understand the situation, they didn't have a right of possession until they received the deed until the right of redemption had expired in April of 1987.

We agree with the analysis of the district court.

Upon our review of the record we find no error by the district court in awarding Hullinger the possession of the property in 1987. We agree with the district court's conclusion that Kansas City Life's right of possession of the property is inferior to Hullinger's leasehold interest since Kansas City Life's right of possession was not acquired until after Hullinger's leasehold interest. Consequently, Kansas City Life's right of possession is subject to Hullinger's rights since he was not served notice of termination pursuant to Iowa Code section 562.6.

## II. *Intentional Interference with Contractual Relations*

Kansas City Life contends that the district court erred in submitting the issues of intentional interference with existing and prospective contractual relations to the jury.

As previously noted, our scope of review on actions at law is on assigned error only. A jury verdict is binding upon the court unless the record lacks substantial evidence. Iowa R.App.P. 4 and 14(f)(1). The trial court has considerable discretion in determining whether evidence is sufficient to submit a claim to the jury. *Oberreuter v. Orion Industries, Inc.*, 398 N.W.2d 206, 209 (Iowa App.1986). We review the evidence in a light most favorable to the trial court's decision. *Kurtenbach v. TeKippe*, 260 N.W.2d 53, 54 (Iowa 1977).

The elements for the tort of intentional interference with a contractual relationship or with a prospective contractual relationship are:

1. Existence of a valid contractual relationship or business expectancy;

2. Knowledge of the relationship on the part of the interferer;

3. Intentional interference causing breach or termination of the relationship or expectancy;

4. Resultant damage to the party whose relationship or expectancy has been disrupted; and where interference with prospective business advantage is alleged, there must also be

5. The actor acted with a purpose to injure or destroy the other party.

*Nesler v. Fisher and Co.*, 452 N.W.2d 191, 194–95 (1990); *C.F. Sales, Inc. v. Amfert, Inc.*, 344 N.W.2d 543, 555 (Iowa 1983) and *Harsha v. State Savings Bank*, 346 N.W.2d 791, 799 (Iowa 1984). We find there is substantial evidence to prove that Kansas City Life directly interfered with the relationship between Hullinger and the United States Department of Agriculture.

Under the substantial evidence standard, if reasonable minds could differ on an issue in light of the evidence presented, the court must submit the issue to the jury. *Swanson v. McGraw*, 447 N.W.2d 541, 543 (Iowa 1989). Evidence is substantial if a jury could reasonably infer from it these elements. *Id.* In addition, even when the facts are not in dispute or contradicted, if reasonable minds might draw different inferences from them a jury question is engendered. *Id.*

Kansas City Life asserts that there is no evidence that it interfered with a contract that was consummated or executed between Hullinger and the United States Department of Agriculture. Kansas City Life further claims that there is no evidence that either Mr. Hullinger or the United States Department of Agriculture ever incurred any contractual obligations as a result of Hullinger's attempt to enroll in the 1987 farm program. We disagree.

The record reveals that a business relationship existed between Hullinger and the Department of Agriculture. Randy Hullinger signed the Department of Agriculture's form titled "Contract to Participate in the 1987 Price Support and Production Adjustment Programs" on July 15, 1986. Prior to April 15, 1987, Kansas City Life was aware that the Hullinger's property was signed up to receive benefits from the

Department of Agriculture's farm program. Duane Hullinger, Randy Hullinger's father, testified that their farm operations had always participated in the farm programs. The arrangements Hullinger had with the Department of Agriculture were of a contractual nature. We believe a jury could find that a business relationship existed between Hullinger and the Department of Agriculture. We find no error here.

Kansas City Life also contends there was no evidence it acted with the intent to interfere with an existing contract between Hullinger and the Department of Agriculture. Kansas City Life asserts that it acted under the reasonable and good faith belief that it was entitled to possession of the property for the 1987 crop year.

As noted, Kansas City Life was aware that the Hullinger's property was signed up to receive benefits from the Department of Agriculture's farm program prior to April 15, 1987. Nevertheless, Kansas City Life proceeded to certify itself as an operator of the farm property on September 30, 1987. On cross examination, Russell Roy, director of mortgages at Kansas City Life, testified as follows:

Q. Okay. In your direct examination you've related a conversation with Mr. Couchman who is the manager of the Wayne County ASCS office and who was in 1987, that related to an attempt by Duane Hullinger to certify the entire acreage with the Wayne County ASCS office. Did that conversation take place in person or by telephone? A. You mean the conversation about certifying the crop? By telephone.

. . . . .

Q. All right. Do you recall if you talked first with Mr. Couchman: A. Yes. I talked to Mr. Couchman.

Q. Okay. And it concerned the certification of this land for participation in the 1987 farm program? A. Yes.

Q. Did he tell you that Mr. Hullinger was there and wanted to certify the land himself? A. Yes.

Q. And in substance you told him that that was not permissible, that Kansas City Life Insurance Company was going to certify it? A. I told him that Kansas City Life would certify it.

Q. Do you recall that you also told that same thing to Mr. Hullinger as a part of that same telephone conversation? ... A. I'm not certain. I remember talking to Mr. Couchman and discussing it with him. I don't believe I spoke with Mr. Hullinger.

Q. Okay. Then later on you had another conversation with Mr. Couchman on or about the 20th day of ... [October], 1987 which related to the attempt by Duane Hullinger to certify or to seal the crop that had been raised on the farm in 1987? ... A. Yes.

Q. And in substance you told Mr. Couchman that Kansas City Life Insurance Company wouldn't consent to their sealing of the grain that was raised on the 820 acres? A. Yes.

Upon our review of the record, we believe there is sufficient evidence to support the jury decision that Kansas City Life intentionally interfered with the contractual relations between Hullinger and the Department of Agriculture. We believe reasonable minds could differ on the issue of intentional interference with contractual relations in light of the evidence presented in this case. Therefore, we find no abuse of discretion on the part of the district court in deciding to submit the claim to the jury. We find no error here.

Kansas City Life also contends there is no evidence supporting Hullinger's claim for intentional interference with prospective contractual relations. Kansas City Life asserts that there is no evidence it acted with the purpose of injuring or destroying Hullinger's business. We disagree.

Hullinger received benefits from the Department of Agriculture's farm program in 1986. As earlier noted, Hullinger was enrolled to participate in the crop program in 1987. Hullinger contends that Kansas City Life was aware that by certifying as an operator, it effectively destroyed his prac-

tice of sealing his 1987 row crop. We agree.

An operator is defined in the appendix to the Department of Agriculture's contract to participate in the 1987 farm program as follows:

> *Operator* means the producer who is in general control of the entire farming operation on the farm during the program year, as determined in accordance with 7 CFR Part 719.

The appendix defines producer as follows:

> *Producer* means a person who as owner, landlord, tenant, or sharecropper shares, or would have shared had the crop been produced, in the risk of producing the crop (or shares in the proceeds therefrom) as determined in accordance with 7 CFR Part 713. The term "producer" as used in this contract shall include both the "operator" and other producers of the crop on the farm.

Mr. Roy testified:

Q. And I want to direct your attention to the dates in the lower left-hand corner of the first sheet of Defendant's Exhibit C [Report of Acreage] and ask you if you recognize those? A. It says KCL or Kansas City Life by JRR which are my initials and dated September 30th, 1987.

Q. So the certification then took place on September 30th of 1987 insofar as the 1987 farm program was concerned? A. That's the day it was signed. This was sometime after—This was sometime after say the—I was in Corydon and, you know, went into the ASCS office and they did all of their measurement and so forth, and it seems to me, I don't know how long after that, they put all of the information together on this form and would send it to me and I signed it.

Q. You signed it on September 30th of 1987? A. Yes.

Q. Okay. Now, in your acquaintance with the 1987 farm program, did that effectively do away with any right of the tenant on that farm or the operator of that farm to seal the 1987 row crops? A. Not to my knowledge.

Q. Didn't one have to participate in the farm program and be an operator or a producer in order to seal the grain that was raised on the farm in 1987? ... A. I would assume so.

Q. I notice that on the Defendant's Exhibit C that you signed up on behalf of Kansas City Life Insurance Company as the operator of the farm: A. Yes.

Q. That appears in the box with your initials; does it not? A. Right.

Q. Well, tell me how Kansas City Life operated that farm; if you will? A. We certainly intended to operate the farm in '87 and things were in a dispute.

Q. Did you operate it? A. Nope.

Q. Okay. So at least that representation is not correct in the certification? A. Possibly not. However, there is no other blank for any—There is three blanks to sign down there as operator's signature and ASCS sent this form to me and told me to sign it at the bottom which I did.

Q. Any of those blanks say producer? A. No.

Mr. Roy later had a telephone conversation with Mr. Wayne Couchman, Director of the ASCS office in Corydon, where he informed the Department of Agriculture that Kansas City Life would not consent to Hullinger's certification of the land to participate in the 1987 farm program. Mr. Roy further informed the Department that Kansas City Life would certify the land. Mr. Couchman testified as follows:

Q. Now had that remained in force without any interference from Kansas City Life, who would have received the 1987 farm program benefits on the acreage of 1,145 acres? A. Well, before this actually could have actually taken effect and been approved for the entire amount, we would have had to have had a document showing that this party actually had control of the property.

Q. All right. Assume that document came forth then? Who then would have received the payments? A. The party on this contract.

Q. And that is John Snook? A. John Snook and—Well, John Snook and Randy Hullinger in succession of interest.

Q. As of August the 12th of 1987 and when Plaintiff's Exhibit 50 shows that Randy Hullinger signed up through his father—A. Yes.

Upon our review of the record, we believe there is sufficient evidence to support the jury decision that Kansas City Life intentionally interfered with the prospective contractual relations between Hullinger and the Department of Agriculture. We believe there was sufficient evidence of an intent to injure Hullinger to create a jury question. Therefore, we find no abuse of discretion on the part of the district court in deciding to submit the claim to the jury. We find no error here.

Kansas City Life also contends the district court's instruction relating to interference with prospective contractual relations was erroneous. Kansas City Life asserts the jury instructions number 6 through 9 failed to distinguish between the torts of intentional interference with contractual relations and intentional interference with prospective business relations.

■ In the conference to discuss the jury instructions prepared by the district court, Kansas City Life did not voice an objection to any of the district court's jury instructions. Kansas City Life's only request regarding the jury instructions was that instruction number 9 should limit Hullinger's counterclaim damages. "We do not consider on appeal objections to jury instructions which were not presented to the trial court." *Kellar v. Peoples Natural Gas Co.*, 352 N.W.2d 688, 693 (Iowa App.1984). Since Kansas City Life did not properly preserve error on this issue in the trial court we do not consider it on appeal.

## III. *Compensatory Damage Award*

Kansas City Life contends that the evidence of damages was too speculative to allow the jury to consider damages in excess of the difference between the sale price and the sealing price of the corn.

■ Under general damage principles, in order to recover for lost profits damages may not be overly speculative. *Jamison v. Knosby*, 423 N.W.2d 2, 6 (Iowa 1988).

The jury returned a verdict for $28,000. in compensatory damages in favor of Randy Hullinger. Kansas City Life filed a motion for judgment notwithstanding the verdict and motion for new trial on various grounds, one of which was that the evidence did not support the compensatory damages awarded by the jury. The district court ruled that the motion for new trial would be sustained if Hullinger did not accept a judgment in the amount of $25,632 within twenty days of the ruling. The district court stated: "The compensatory damage award of $28,000 is not supported by the evidence. Under the record the maximum amount of compensatory damages which the jury could have found was $25,-632." Hullinger subsequently accepted the reduction in judgment, and the district court overruled Kansas City Life's motion. The district court then granted remittitur to the amount of $25,632.

■ Where the trial court permits a party to avoid a new trial by agreeing to conditions it may impose, "[a]ny such term or condition or judgment entered pursuant thereto shall be deemed of no force and effect and the original judgment entered ... shall be deemed reinstated in the event of an appeal." Iowa R.Civ.P. 250. Therefore, since Kansas City Life appealed the original jury verdict of $28,000 in compensatory damages was reinstated.

■ Contrary to Kansas City Life's contention, we believe the record reveals sufficient evidence to determine the amount of damages suffered by Hullinger. Paul Umbenhower, the owner of Chariton Feed & Grain in Chariton, Iowa, testified concerning the market values of corn in June, July, and August, 1988. Mr. Umbenhower testified about the average, low and high prices he paid per bushel each of the three months. He stated the low price for corn was on June 1, 1988, which was $1.86, and the high price for corn was on June 27, 1988, which was $3.01 per bushel. He further stated that it would cost $.12 per

bushel to transport the corn from Hullinger's farm to his grain elevator in Chariton. Mr. Hullinger testified that he sold the corn for $1.45 per bushel.

The jury awarded Hullinger $28,000. The district court entered a remittitur in the amount of $25,632, the maximum amount of damages the jury could have awarded. This figure was calculated by using the $3.01 price per bushel for corn which was the high price paid for corn by the Chariton elevator during the three months of June, July, and August, 1988. The $.12 transportation charges and the $1.45 Hullinger received for his corn is deducted from the $3.01 per bushel which equals $1.44 price per bushel. This figure is then multiplied times the 17,800 bushels of corn harvested which equals $25,632. Kansas City Life asserts the district court erred in simply remitting the award of damages to $25,632. We disagree.

In *K–B Trucking Co. v. Riss International Corp.*, 763 F.2d 1148, 1162–63 (10th Cir.1985), the court noted that there are a number of approaches in setting the proper amount of the remittitur. The *K–B Trucking* court concluded that remitting a jury award based on the maximum amount of damages that is reasonably supported by the evidence in the record is an appropriate remedy. *Id.* at 1163; *see also Ogilvie v. Fotomat Corp.*, 641 F.2d 581, 586 (8th Cir. 1981). We believe the district court's decision to grant remittitur in this case where the jury awarded actual damages in excess of the amount proved is an appropriate remedy. We find no error.

### IV. *Punitive Damages*

Kansas City Life finally contends there was no evidence of reckless or malicious actions to support an award of punitive damages. Kansas City Life asserts that the district court erred in concluding that there was sufficient evidence of malicious conduct which would support a jury verdict of punitive damages. We agree.

 Punitive damages may be awarded upon a showing of legal malice. *Midwest Management Corp. v. Stephens*, 353 N.W.2d 76, 82 (Iowa 1984). Legal malice may be established by showing wrongful or illegal conduct committed or continued with a willful or reckless disregard of another's rights. *Id.*

 Hullinger asserts that repetitive acts committed by Kansas City Life represented the kind of legal malice necessary for assessment of punitive damages. We disagree. From the facts and circumstances in evidence in this case, we believe there is no substantial evidence which supports a finding that Kansas City Life's actions were done with the requisite malice in order to uphold a verdict for punitive damages. Consequently, we find the district court erred in submitting the punitive damages issue to the jury for its consideration.

In summary, we find no error by the district court in awarding Hullinger the possession of the property in 1987. We also find no error on the part of the district court in submitting the issues of intentional interference with existing and prospective contractual relations to the jury. We agree with the district court's decision to grant remittitur in this case. Further, we find the district court erred in concluding that there was sufficient evidence of malicious conduct which would support a jury verdict of punitive damages.

We affirm in part and reverse in part.

AFFIRMED IN PART AND RE-VERSED IN PART.

DONIELSON, J., concurs.

SACKETT, J., dissents.

HAYDEN, J., takes no part.

SACKETT, Judge (dissenting)

I dissent. I would reverse the determination Hullinger was entitled to possession of the farm for the crop year 1987. I would find the trial court erred in not granting a judgment notwithstanding the verdict.

I must disagree with the majority on an issue their opinion does not specifically address, that is, should Iowa Code section 562.6 be construed to allow a sublessee to retain a farm tenancy for a succeeding

year when the tenancy with the original lessee has been terminated. I find no Iowa case law on this specific point. I do not, however, interpret section 562.6 to allow a sublessee to hold over under such circumstances. I find no requirement under the statute that a landlord serve both a tenant and a subtenant. I feel extending the statute to so provide would be contrary to legislative intent and would create an area of uncertainty in the termination of farm tenancies not envisioned by the statute.

The relevant facts simply are these. The land was leased by the receiver to Snook. The receiver was the party in possession and the person entitled to lease. Snook was served with notice of termination of tenancy on August 15, 1986. After leasing the farm, Snook sublet to Lukane Corp. Lukane Corp. sublet to Hullinger. The receiver-Snook and the Lukane Corp.-Hullinger leases were both cash rent leases. They both called for cash rent of $20,000. The leases were on different forms.[1] They had different terms. The receiver-Snook lease called for the cash rent to be due May 1, 1986, while the Lukane Corp.-Hullinger lease provided the cash rent was due December 1, 1986. The receiver was not a party to the subleases and did not consent to the subleases.

I.

Hullinger has no basis to claim he can hold over for the 1987 crop year. Generally, a lessee cannot create a greater interest in a lease than the interest the lessor has. *See* Am.Jur.2d *Landlord and Tenant* § 12, at 56 (1970). The notice to terminate given Snook satisfied the statutory requirement to terminate the Snook lease. Hullinger's rights flowed from the Snook lease. The statute provides for service on either party *or* a successor of the party. These words contemplate a single service, even though someone (as did Hullinger here) has succeeded to the rights of either the contracting landlord or tenant.

The statute uses the word *or*, and consequently does not envision the necessity of serving a series of persons. We must not, under the guise of construction, extend, enlarge, or otherwise change the terms of a statute. *Read v. Estate of Mincks*, 176 N.W.2d 192, 194 (Iowa 1970).

I have furthermore considered the fact that the statute talks in terms of the lease, not a possessory right, and there is no requirement to serve or identify a party in possession. This tells me the statute does not contemplate the landlord making an inquiry to determine interests of persons beyond the interests of those persons contracting with the landlord.

II.

The decision reached by the majority does not reasonably assign the risk to the person best able to provide for it. In interpreting the law, we need to give some consideration to the position of a party to correct or minimize the problem. *See Fritz v. Parkison*, 397 N.W.2d 714, 716 (Iowa 1986). The prospective tenant can more easily ascertain the nature and extent of his or her landlord's interest in the land than can the landlord seeking to terminate a farm lease seek to ascertain persons who may claim lease rights through the contracting tenant. An astute tenant will make inquiry to ascertain that the landlord has an interest to lease. Furthermore, inquiry as to a certain person's or persons' ownership of a specific tract of land is not burdensome.

A requirement that a landlord serve notice on any persons claiming to be subtenants to extinguish any possible rights would be difficult—nearly impossible—and would open the door to fraudulent claims of subleases. A terminating landlord would be required to make an inquiry and search the countryside to ascertain the names and addresses of any persons who might claim they were a tenant by virtue of a sublease with the contracting tenant. There is no way to assure they could all be

1. I have made no attempt to compare their provisions but they appear at first blush to be somewhat similar.

found prior to September 1. Frequently, when a farm tenancy is terminated, the feelings between landlord and tenant are hostile. Consequently, it is not reasonable to assume the tenant would cooperate in identifying subleases before the date for terminating tenancies. The subtenant would benefit by not being identified and served. There would be an open invitation for tenants and friends, after the periods for termination had expired, to seek to establish that subleases existed that had not been terminated.

### III.

To adopt the majority position will establish uncertainty on issues of terminating farm leases. While I recognize the purpose of the statute is to protect the farm tenant and I applaud such protection, I also recognize an additional reason was to provide for certainty on who was going to farm land in the next year to allow planning for fall work and the purchase of seed, chemicals, fertilizer, and other cropping decisions.

Because subtenants are not readily ascertainable, there will be no certainty that claims of leases for the ensuing crop year have been extinguishable, leaving uncertainty as to the landlord's ability to enter into new leases. Furthermore, there will be uncertainty as to terms of an alleged lease. For example, here Snook owed his cash rent to the receiver by May 1. According to the Hullinger sublease, he owed cash rent by December 1. Snook's lease was terminated. What lease would the majority determine Hullinger carried over under? Under the majority's holding, can a landlord be forced to honor a sublease when the terms are more favorable than the terms of the original lease?

Section 562.6 has been determined to operate only to extend the tenancy on the same terms and conditions as the original lease. *Ganzer v. Pfab*, 360 N.W.2d 754, 756 (Iowa 1985). Because I find the service of notice on Snook was sufficient to terminate Hollinger's lease, I would find plaintiff should have a judgment notwithstanding the verdict. Even if I had found, under this record, Hullinger had a lease for the 1987 crop year, I would have found a judgment notwithstanding the verdict should have been entered. There were numerous uncertainties in this case, and valid arguments for plaintiff's contention it was entitled to the land during the 1987 crop year. The actions for which it is penalized are the actions in seeking to assert these rights. It had a basis for doing so. The fact plaintiff sought to assert these rights does not support a finding of interference with a contract.

I would reverse and enter judgment for plaintiff.