Janet HENRICH, Appellee,

v.

Jeffrey LORENZ, Jim Schmitz, Thomas Dunlop, Bob O'Brien, Dave Andresen, and Dan Richardson, Appellants.

No. 88–699.

Supreme Court of Iowa.

Nov. 22, 1989.

Emmanuel S. Bikakis of Bikakis, Vohs, Storm & Arneson, Sioux City, and Robert G. Allbee of Ahlers, Cooney, Dorweiler,

Haynie, Smith & Allbee, Des Moines, for appellants.

Colin J. McCullough of McCullough Law Firm, Sac City, for appellee.

McGIVERIN, Chief Justice.

Plaintiff, Janet Henrich, was injured in the course of her employment at the Iowa Beef Processing, Inc., meat packing plant at Storm Lake (IBP Storm Lake). She received workers' compensation benefits for her injury from her corporate employer. Henrich then sued several supervisory and management employees at IBP Storm Lake, alleging that their gross negligence was a proximate cause of her injury. The case was submitted to the jury over the defendants' motion for a directed verdict. The jury returned a substantial verdict for Henrich. Defendants' posttrial motion for judgment notwithstanding the verdict or, alternatively, for a new trial, was overruled. Judgment was entered on the verdict. Defendants appealed.

Although defendants raise several issues for review, we need address only two: first, the district court's subject matter jurisdiction over the case; and second, the sufficiency of the evidence to support the verdict. We reverse on the second issue alone.

I. *Background facts and proceedings.* In reviewing the district court's denial of defendants' motion for a directed verdict and defendants' posttrial motion for judgment notwithstanding the verdict, we view the record in the light most favorable to the plaintiff. From the evidence, the jury could have found the following to be true.

Henrich applied for work at IBP Storm Lake on October 20, 1983. A few days later she was interviewed by defendant Thomas Dunlop, plant personnel manager. She was subsequently hired, and began work on October 28 with a full day of group orientation. At orientation, Henrich received various handouts, including one addressing work safety. Among other people, Dunlop addressed Henrich and the other new employees who were assembled for orientation.

Henrich's first day of production work in the plant was October 31. The company provided her cotton gloves, rubber gloves, a hard hat and ear plugs. Although initially assigned to clean-up duties, on November 4 Henrich was assigned to learn to operate a butt skinner machine.

A butt skinner is used to remove a layer of fat from a cut of pork known as the shoulder butt. The machine has a tray on which the operator places the shoulder butt and a motorized tooth roller that draws the butt toward two stainless steel cutting blades. A crank adjusts the distance between the cutting blades, and a separate lever allows the operator to lift the cutting blades away from the tooth roller. At the time, the machine at IBP Storm Lake had a push button power shut-off switch located on the right side of its base, below the tray.

The butt skinner operator's task is to position the shoulder butt flat on the tray so that the roller catches its corner. If the roller does not catch the butt, the operator is instructed to exert downward pressure on the butt. In practice, the operators often push the butts toward the cutting blades. This is done, for example, when overly cold butts or dull cutting blades hinder the machine's "take up" of butts.

Henrich was assigned to operate the butt skinner by the general cut floor supervisor, defendant Jim Schmitz. Schmitz introduced Henrich to the assistant cut floor supervisor, defendant Jeffrey Lorenz. Henrich was wearing the company-provided cotton gloves with the rubber gloves over them for warmth. Schmitz told Henrich that Lorenz would be her supervisor and that Lorenz and Dan Moeller, a fellow production worker and experienced butt skinner operator, would train her to run the machine.

Lorenz showed Henrich how to adjust the cutting blades, how to lift them from the tooth roller, and how to shut the machine off. He instructed Henrich to rest the butt on the tray and to keep her hands away from the cutting blades and roller. He demonstrated Henrich's new task at

least once. He left Henrich with Moeller for further training.

After demonstrating the operation of the butt skinner for about half an hour, Moeller again instructed Henrich on the same things Lorenz had instructed her. Henrich operated the machine in increasing intervals for the rest of that day and for her full shift the next day. Moeller watched and instructed Henrich the entire time, and took over for her whenever she fell behind the pace of the production line. Lorenz observed Moeller giving Henrich further instruction. Moeller reported to Schmitz, Lorenz, and another assistant supervisor that Henrich was doing well on the butt skinner and operating it according to instructions. At the time of the accident, Moeller was still training Henrich and assisting her as needed.

The accident occurred on the morning of November 7, Henrich's third day operating the butt skinner. Henrich set a shoulder butt on the tray. While guiding the butt to the roller, her gloved right hand slipped off the butt and into the cutting blades of the machine. She later testified that the roller grabbed her glove and pulled her hand into the machine. With Moeller's help, Henrich was able to pull her hand from the machine almost immediately, but it had already been injured.

The defendants named in Henrich's suit were various supervisory and management employees at IBP Storm Lake. Defendant Bob O'Brien was plant manager. He directly supervised the plant superintendent, Gary McVey, who was not named as a defendant; the plant mechanical engineer, defendant Dave Andresen; and the plant personnel director, defendant Thomas Dunlop. Defendant Jim Schmitz, the general cut floor supervisor, was one of five general area supervisors who worked under McVey. (The other four supervised areas of the plant other than the cut floor.) Schmitz, in turn, supervised three assistant cut floor supervisors: defendant Jeffrey Lorenz, who was in charge of the area where Henrich was working as a butt skinner operator; defendant Dan Richardson, who was in charge of another area of the cut floor; and Bill McCoy, who was in charge of a third area of the cut floor and who was not named as a defendant. As previously noted, Henrich and Moeller worked under Lorenz's supervision.

Henrich's petition alleged that the defendants were grossly negligent in failing to warn her of the hazardous condition of the butt skinner; in allowing the machine to be operated when it constituted an unreasonable safety hazard; and in failing to oversee, inspect, discover and prevent hazardous working conditions at the plant. The defendants' answer denied any negligence or gross negligence, alleged that workers' compensation was Henrich's sole remedy, and asserted that Henrich assumed the risk of operating the butt skinner or was contributorily at fault in causing her injury. At trial, Henrich's case consisted of showing a combination of working conditions at the plant which, she alleged, were the equal responsibility of each defendant.

The jury could have found that the defendants knew that production workers at IBP often wore gloves while working. The temperature on the cut floor was always between 45 and 50 degrees Fahrenheit, and the temperature of the meat handled there was 36 to 38 degrees Fahrenheit, or colder. IBP allowed its workers to wear gloves for comfort and to prevent numbness of fingers around knives and meat cutting machinery. The evidence was that if a worker's hands became cold, that would be a safety hazard.

The decision to provide gloves was made on the corporate level and not by anyone at IBP Storm Lake. Similarly, the temperature of the room and the temperature of the meat were set by the company in compliance with government sanitation standards. The defendants had no choice in these matters.

The manufacturer's maintenance manual for the butt skinner instructed that machine operators and supervisors should read the manual, and that gloves should not be worn while operating the machine. Out of all the defendants, only Andresen knew of the existence of this manual, and not even he knew of the specific admonition

against wearing gloves. None of the other defendants made an effort to "seek out" the manual which, as noted, they did not know existed. The manual, of course, was not made available for Henrich's inspection. At trial, Henrich also produced a meat industry publication which warned that machine operators in the industry should not wear gloves.

There was evidence that a warning plate had been removed from, or had fallen off of, the butt skinner sometime after it came under the control of IBP, but not by or at the direction of any defendant. The plate had warned the operator of the machine not to wear gloves. The jury could have found that some of the defendants had seen the warning plate when it was on the machine.

The power shut-off switch on the butt skinner was located at a place on the machine where, if the operator's right hand were caught in the machine, the operator probably would be unable to shut the machine off. Henrich presented evidence that when the machine left its manufacturer, it had also been equipped with a foot switch; but there was no evidence that IBP, as opposed to the prior owner of the Storm Lake plant and the butt skinner, had removed the foot switch. The defendants were not aware of this machine modification.

In addition, the jury could have found that on the day Henrich was injured, the cutting blades in the butt skinner were dull, the butts themselves were overly cold, and the production line had not been slowed to make it easier for Henrich to keep up. Moeller, however, was still training Henrich and would periodically take over the machine from her in order to keep the work station up to pace.

There was also testimony that Moeller had asked Lorenz for a blade change for Henrich's machine over an hour before the accident, but Lorenz had not yet arranged for one. Lorenz denied that anyone had asked him for a blade change that day. The maintenance department ordinarily

changed the blades at each break in production (roughly every two and a half hours), but the evidence conflicted over whether the blades in Henrich's machine had been changed at the break preceding her accident. The defendants knew that dull blades made butt skinner work more difficult, and would likely result in the butt skinner operators pushing butts toward the cutting blades instead of simply placing them on the butt skinner tray.

Finally, some of the defendants were members of the plant safety committee. The plant safety committee met once a month to discuss safety conditions in the plant. At the time Henrich was injured, IBP Storm Lake did not have a safety director. The safety committee consisted of O'Brien; McVey; Dunlop; Andresen; and ten to fifteen production workers, one or two from each area of the plant. Safety problems were to be brought to the attention of an area representative or supervisor as they were discovered by those who worked in the plant. In turn, that person would bring the matter before the safety committee. After a safety committee recommendation, O'Brien had the authority to approve the recommendation, but he could not countermand any decision made on a level of management above him.

Although the evidence conflicted, the jury could have found that a complaint had been made to the committee, at one of its last two meetings prior to Henrich's accident, about the periodic dullness of the cutting blades and about the tendency of the rubber gloves to become slippery. There was no evidence of any complaint about the shut-off switches.

II. *Jurisdiction of the district court under Iowa Code section 85.20.* The threshold question here is whether the district court had subject matter jurisdiction over the suit against these defendants. The issue came to the fore in an argument over what jury instruction should be given regarding whether the defendants were Henrich's coemployees.[1] The district court

---

1. The term "coemployee" does not appear in chapter 85. We use the term as a substitute for

the "other employee of such employer" language in Iowa Code section 85.20(2).

treated the question as one of fact for the jury.

Iowa Code section 85.20 (1983) provides, in relevant part:

The rights and remedies provided in this chapter ... for an employee on account of injury ... for which benefits under this chapter ... are recoverable, shall be the exclusive and only rights and remedies of such employee ... at common law or otherwise, on account of such injury ... against:

1. his or her employer; or

2. any other employee of such employer, provided that such injury ... arises out of and in the course of such employment and is not caused by the other employee's gross negligence amounting to such lack of care as to amount to wanton neglect for the safety of another.

The term "employee," as used in chapter 85, is defined in section 85.61(2). That definition includes:

[A] person who has entered into the employment of, or [who] works under contract of service, express or implied ... for an employer, [and] every executive officer ... of a corporation, including a person holding an official position, or standing in a representative capacity of the employer....

The defendants argue that allowing section 85.20 suits against supervisory and management employees circumvents the exclusivity of remedy provisions of our workers' compensation law, because the employer will bear the burden of such suits through indemnification of those employees. They urge us to equate the position of supervisory and management employees with that of their employer, thereby barring coemployee gross negligence suits against supervisors and managers. Alternatively, defendants argue that the district court's instruction to the jury on the definition of "coemployee" was too broad. They argue that the jury should have been instructed that only employees of a common employer who are engaged in the same enterprise or task and "so related in their labor that because of proximity or otherwise, there is a special risk of harm to one of them if the other is negligent" are coemployees. Henrich contends that the court properly instructed the jury that employees working for a common employer and engaged in the same general business, although in different "grades or departments," are coemployees under chapter 85.

We think that both parties miss the mark. The jury should not have been instructed on this issue at all, for if the defendants were, in fact, in the position of Henrich's employer, then the court lacked subject matter jurisdiction over Henrich's suit. Jurisdiction over Henrich's complaint would lie exclusively with the industrial commissioner. *See Glenn v. Farmland Foods, Inc.*, 344 N.W.2d 240, 242–43 (Iowa 1984).

We discussed the issue of subject matter jurisdiction over section 85.20 gross negligence suits at some length in *Tigges v. City of Ames*, 356 N.W.2d 503, 509–12 (Iowa 1984). There we noted that the question of subject matter jurisdiction may be raised at any time, by any party, or by the court. *Id.* at 510. We said:

When its very power to proceed is at issue, a court has the power and duty to determine whether it has jurisdiction of the matter presented.... *We disagree with [Tigges] that this is a matter which must be submitted to the jury. Although many times the issue requires a factual determination, the court must determine its own authority to hear a case.*

*Id.* at 511–12 (emphasis added).

We now reiterate that the question of each defendant's status—employer, coemployee, or neither—is a determination prerequisite to the court's jurisdiction and, as such, it is for the court to decide. If the court finds that a defendant is the plaintiff's employer, then the court has no subject matter jurisdiction over a section 85.20 gross negligence suit against that defendant. If the court finds that a defendant is the plaintiff's coemployee, then the jury

should be so instructed.[2] Therefore, the district court erred in submitting this issue to the jury.

■ Nevertheless, the defendants are not entitled to reversal on this ground, for they are clearly Henrich's coemployees under chapter 85. The legislature may act as its own lexicographer. *See, e.g., Cedar Rapids Community School Dist. v. Parr,* 227 N.W.2d 486, 495 (Iowa 1975). In section 85.61, the legislature has defined what it means by "employee" in chapter 85.

The statutory definition of "employee" is a broad one, beginning with "a person who has entered into the employment of, or [who] works under contract of service, express or implied ... for an employer...." Iowa Code § 85.61(2). The definition has certain exceptions not applicable here. Iowa Code § 85.61(3). Even executive officers and representatives of the employer, however, are expressly said to be employees under the statute. Iowa Code § 85.61(2). Surely the legislature intended that supervisors and managers—the defendants here—also be included in the broad definition of "employee" under section 85.61.

We conclude that the defendants are "employees" of IBP within the meaning of section 85.61(2). Henrich was also employed by IBP. The parties agree that they were all engaged in the same general business of IBP, namely, meat packing at IBP Storm Lake. Nothing in chapter 85 requires that employees of a common employer be working at similar tasks or in close proximity to one another to qualify as coemployees under section 85.20. As a matter of law, the defendants are Henrich's coemployees under that section.

We conclude that because Henrich and the defendants were coemployees, the district court had subject matter jurisdiction over this section 85.20 gross negligence suit.

■ III. *Coemployee gross negligence suits under Iowa Code section 85.20.*

Iowa Code chapter 85 plainly bars an employee's tort suit against her employer—and with one exception, against her coemployees—for injuries sustained in the course of employment. *Taylor v. Peck,* 382 N.W.2d 123, 126 (Iowa 1986). The one exception allows an employee whose injuries were caused by the conduct of a coemployee to recover damages from that coemployee if the conduct constituted "gross negligence amounting to such lack of care as to amount to wanton neglect for the safety of another." Iowa Code § 85.20. Simple or ordinary negligence will not justify recovery. *Taylor,* 382 N.W.2d at 126.

The requirements of section 85.20 were first considered by this court in *Thompson v. Bohlken,* 312 N.W.2d 501 (Iowa 1981). There we explained the concept of "gross negligence amounting to such lack of care as to amount to wanton neglect" made actionable by section 85.20. We concluded that there are three elements that must be proved by a plaintiff to establish that level of negligence on the part of a coemployee-defendant:

(1) knowledge of the peril to be apprehended;

(2) knowledge that injury is a probable, as opposed to a possible, result of the danger; and

(3) a conscious failure to avoid the peril.

*Id.* at 505.

Beginning with *Thompson,* our cases have demonstrated that the scope of coemployee gross negligence claims authorized by the legislature under section 85.20 is "severely restricted, particularly by adding the requirement of wantonness in defining gross negligence." *Woodruff Constr. Co. v. Mains,* 406 N.W.2d 787, 789 (Iowa 1987). In *Woodruff,* we again explained that:

[t]he usual meaning assigned to "willful," "wanton" or "reckless," according to taste as to the word used; is that the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it,

---

**2.** If the court finds that a defendant is neither the plaintiff's employer nor the plaintiff's coemployee, then the action is not directly affected by Iowa Code chapter 85 and the court should proceed accordingly.

and so great as to make it highly *proba-ble* that harm would follow.

*Id.* at 790 (quoting W. Prosser, *The Law of Torts* § 34 at 185 (4th ed. 1971)) (emphasis in *Woodruff*). We continued:

The Restatement of Torts labels both "wanton" and "willful" misconduct as "reckless disregard for the safety of another." It distinguishes this type of misconduct from intentional misconduct only in that [in] the former a strong probability of harm is required while in the case of intentional misconduct, substantial certainty of harm is required.

*Id.* (citing Restatement (Second) of Torts § 500(f), at 590 (1965)). In *Thompson,* we said that the concept of wantonness "involves the combination of attitudes: a realization of imminent danger, coupled with a reckless disregard or lack of concern for the *probable* consequences of the act." *Thompson,* 312 N.W.2d at 505.

We very recently reviewed the facts of our section 85.20 cases since *Thompson* and need not repeat that discussion here. *See Swanson v. McGraw,* 447 N.W.2d 541, 543–45 (Iowa 1989).

IV. *Sufficiency of the evidence.* The gist of Henrich's complaint is that each defendant was grossly negligent in allowing a combination of working conditions to exist under which it was probable that someone would be injured by having their hand drawn into the butt skinner machine, and in failing to warn their coemployees of those conditions.

In order to recover for her injuries from a coemployee, Henrich's claims of gross negligence must meet all the requirements of *Thompson* as to that coemployee. On review, we must determine whether there is substantial evidence to support each element of her case. If there is not, then the defendants should have been granted a directed verdict or judgment notwithstanding the verdict. *Valadez v. City of Des Moines,* 324 N.W.2d 475, 477–78 (Iowa 1982). We view the evidence in the light most favorable to the plaintiff. *Id.*

■ Under this view of the evidence, we think that Henrich has failed to prove the gross negligence of any defendant.

Even with the condition of the butt skinner and prevailing working conditions and work practices being what they were, the evidence shows that butt skinner machine injuries like Henrich's were not the probable, as opposed to a possible, result of the conditions. IBP Storm Lake employees had experienced only four skinner-related hand cuts in the year preceding Henrich's accident; yet almost 3.1 million shoulder butts were skinned in that period. None of the injuries was serious. Although Henrich's counsel ascribes this statistic to "luck," we think it shows that the butt skinner, as it existed and as it was operated at IBP Storm Lake, was not a peril that would probably result in injuries.

Moreover, even assuming that the jury could have found that the conditions at IBP Storm Lake were such that injuries like Henrich's were probable, the defendants did not have knowledge of that probability. On the contrary, the defendants knew that butt skinner injuries were minor and infrequent. We also think it significant that many of the defendants themselves had operated the butt skinner under the same conditions and with the same instructions Henrich complains of here. Had the defendants known that these conditions and instructions would probably result in injury to the butt skinner operator, we doubt that they would have endangered themselves or Henrich.

The distinction between this case and the one section 85.20 gross negligence case in which this court has held that a jury question was generated on the question of a coemployee-defendant's gross negligence is apparent. In *Swanson v. McGraw,* 447 N.W.2d 541 (Iowa 1989), there was evidence that defendants knew that with the tear in the plaintiff's pants, the safeguards remaining to protect the plaintiff from the highly caustic chemicals with which he worked were inadequate. Due to the condition of his pants, the plaintiff had come dangerously close to being burned by the chemicals just the day before, and defendants knew that fact. Nevertheless, defendants ordered the plaintiff to proceed in the

face of the known danger to him. We held that the plaintiff's evidence generated a jury question on the issue of the defendants' "gross negligence amounting to such lack of care as to amount to wanton neglect."

In contrast to *Swanson*, in this case the defendants—as well as Henrich—relied on their employer's decision that glove use was appropriate, and even desirable, in view of the cold working environment. The defendants had no reason to believe that Henrich and her fellow butt skinner operators were not adequately protected; none of the minor injuries related to skinner work in the past had been attributed to glove use or to the condition of the machine. The low historical incidence of injuries on the butt skinner gave the defendants no reason to believe that injuries would probably occur under the prevailing conditions. *Cf. Thompson*, 312 N.W.2d at 505 (incidence of prior injuries not enough to establish that manager knew plaintiff's injury was probable, where prior injuries had not been blamed on circumstances similar to those causing plaintiff's injury). In this case, the defendants realized no imminent danger in the conditions surrounding the butt skinner's operation; their conduct does not show reckless disregard for the probable consequences of their acts or, for that matter, for the acts of their employer.

■ In sum, the record shows that IBP—not the defendants—was responsible for creating what were, possibly, dangerous working conditions around the butt skinner machine. IBP provided the machine in the condition it was in, and IBP provided the gloves for machine operators to use. But IBP's negligence is not at issue here. The defendants did not create whatever peril existed, and they had no reason to believe that Henrich and her fellow butt skinner operators were being exposed to a risk of imminent harm. Without such knowledge, defendants' conduct cannot fairly be characterized as wanton disregard for Henrich's safety.[3]

Henrich argues that a corporate employer, being a fictitious entity, necessarily acts only through the effort of its officers, agents and employees. *Kerrigan v. Errett*, 256 N.W.2d 394, 396 (Iowa 1977). From this she concludes that some or all of the defendants must be held responsible for the conditions she complains of here. But we have recognized that not all corporate officers, agents, and employees become liable for breach of a duty of the corporation. *Id.* The corporation answers for its conduct by paying workers' compensation. IBP may have breached its duty to Henrich to provide her a safe place to work, but the defendants cannot be blamed for that breach unless their individual *Thompson* gross negligence contributed to it.

Henrich also refers to statements in the record to the effect that "everyone at IBP Storm Lake was responsible for safety." She points to the fact that all supervisory and management employees—as well as anyone else working at IBP Storm Lake— could move to correct unsafe working conditions by bringing them to the attention of the plant safety committee. Nevertheless, the record shows that the coemployee-defendants had no knowledge that the combination of conditions under which Henrich worked would probably result in injury to a butt skinner operator. We conclude that there is insufficient evidence of gross negligence on the part of the coemployee-defendants to satisfy the criteria set forth in *Thompson*. The defendants' motion for

---

**3.** We recognize that our law does not afford coemployees one prior incident of *Thompson* gross negligence before holding them responsible for the consequences of their conduct. We also cannot accept, however, Henrich's suggestion that the "knowledge of probable injury" prong of *Thompson* is satisfied simply because the defendants knew that sooner or later, someone would be injured on a butt skinner. The defendants' knowledge of the actuarial foreseeability—even certainty—that "accidents will happen" does not satisfy *Thompson*. Unless the defendants knew that their conduct would place their coemployees in imminent danger, so that someone would probably—more likely than not—be injured because of the conduct, then the knowledge does not satisfy the essential elements of a section 85.20 gross negligence action as set forth in *Thompson*.

judgment notwithstanding the verdict should have been granted.

V. *Disposition.* In light of our conclusion on the issue of gross negligence, we need not decide whether defendants would be entitled to reversal for alleged evidentiary and jury instruction errors in the district court. There is insufficient evidence of gross negligence under the *Thompson* standards. Therefore, the judgment of the district court is reversed.

REVERSED.

All justices concur except HARRIS, J., joined by LAVORATO and SNELL, JJ., who dissent.

HARRIS, Justice (dissenting).

I respectfully dissent because I think a jury case was presented on the issue of gross negligence. The question is not whether we privately think the multiple acts of negligence shown amount to gross negligence. The question is whether there was sufficient evidence to form a legal basis to support the jury's conclusion that there was.

A sometimes blurred line separates cases of combined acts of ordinary negligence and gross negligence, which the statute defines as "such lack of care as to amount to wanton neglect of the safety of another." Iowa Code § 85.20 (1989). *See Swanson v. McGraw,* 447 N.W.2d 541 (Iowa 1989). I think the jury could find that line was crossed here. Most of the defendants served on the plant safety committee. Yet they allowed this worker, in her third day on an exceedingly dangerous job, to face an impossible dilemma. According to the machine's manufacturer, it was dangerous for her to wear gloves. According to the temperature in the work place, it was dangerous for her not to. The company therefore provided the gloves which, according to the jury verdict, we can assume caused her hand to be snatched into the machine.

Defendants also knew the machine became repeatedly dull, in fact was to be resharpened shortly after the accident. When dull it invited more danger because it was less effective and the worker had to press harder on the meat pieces. Yet the defendants allowed the machine to be operated by the plaintiff after a foot operated shut-off switch was removed. The jury could believe the shut-off switch could have avoided or greatly minimized plaintiff's injuries.

This was an accident which was almost bound to happen. Chances of injury to someone approached mathematical certainty. I do not share the majority's belief that the relative infrequency of certain injury rendered the negligence ordinary rather than gross.

I would affirm.

LAVORATO and SNELL, JJ., join this dissent.