# IN THE COURT OF APPEALS OF IOWA

No. 19-1851
Filed January 21, 2021


**JEFFREY A. OPPEDAHL, Individually and as next best friend of W.T.O., a minor, M.J.O., a minor, and S.M.O., a minor and ANGELA M. OPPEDAHL, an individual,**
　　　　Plaintiffs-Appellants,

**vs.**

**VARIOUS EMPLOYEES OF THE IOWA DEPARTMENT OF TRANSPORTATION, including but not limited to the following: JOHN D. CHESTER; MICHAEL J. KENNERLY; KENT NICHOLSON; ROBERT L. STANLEY; and JIM PETERS and various JOHN DOE employees of the IOWA DEPARTMENT OF TRANSPORTATION,**
　　　　Defendants-Appellees.
_____


　　　　Appeal from the Iowa District Court for Boone County, Amy Moore, Judge.


　　　　The plaintiffs appeal the district court's order granting summary judgment in favor of the defendants. **AFFIRMED.**


　　　　Marc A. Humphrey and Timm W. Reid, Des Moines, for appellants.

　　　　Thomas J. Miller, Attorney General, David S. Gorham, Special Assistant Attorney General, and Robin G. Formaker, Assistant Attorney General, for appellees.


　　　　Heard by Bower, C.J., and Vaitheswaran and Greer, JJ.

**VAITHESWARAN, Judge.**

Jeffery Oppedahl worked for the Iowa Department of Transportation (DOT) as "soils party chief," a job that required him to drill for soil samples. Oppedahl was severely injured while operating a truck-mounted drill and auger on a platform located approximately eighteen inches from the drilling mechanism.[1] Oppedahl, individually and on behalf of his wife and minor children (collectively, Oppedahl) sued DOT employees John Chester, Robert Stanley, Kent Nicholson, Michael Kennerly, and Jim Peters.[2] He alleged co-employee gross negligence pursuant to Iowa Code section 85.20(2) (2017).

The co-employee negligence claim survived the defendants' motion to dismiss. The defendants followed up with a summary judgment motion, which the district court granted. Oppedahl appealed.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3). Our

---

[1] "An auger is a long tube with a helical steel outcropping used to drill holes, similar to a screw or drill bit." *Oppedahl v. Mobile Drill Int'l, Inc.*, 899 F.3d 505, 507 n.1 (8th Cir. 2018).

[2] Oppedahl also sued the State of Iowa and the DOT under a "dual capacity doctrine." The district court granted the defendants' motion to dismiss that claim, reasoning:

> Negligence under the dual capacity doctrine as a means to circumvent the exclusivity of the rights and remedies provided by the Iowa Workers' compensation system is not just a new cause of action, it is one the Iowa Supreme Court has specifically rejected. *See Jansen v. Harmon*, 164 N.W.2d 323, 327–30 (Iowa 1969); *Reedy v. White Consol. Industries, Inc.*, 503 N.W.2d 601, 603 (Iowa 1993).

Oppedahl does not appeal the dismissal of the claim.

review is for correction of errors at law. *See Barker v. Capotosto*, 875 N.W.2d 157, 161 (Iowa 2016).

Generally, the State's workers' compensation system is the exclusive remedy against an employer and another employee for workplace injuries. *See* Iowa Code § 85.20. An exception to that rule exists when the injury is "caused by the other employee's gross negligence amounting to such lack of care as to amount to wanton neglect for the safety of another." *Id.* § 85.20(2). The exception is "a narrow one." *Walker v. Mlakar*, 489 N.W.2d 401, 405 (Iowa 1992). "[W]hen compared to simple negligence, adding the requirement of wantonness severely restrict[s] the application of section 85.20." *Dudley v. Ellis,* 486 N.W.2d 281, 283 (Iowa 1992). To prevail, the plaintiff must prove: "(1) knowledge of the peril to be apprehended; (2) knowledge that injury is a probable, as opposed to a possible, result of the danger; and (3) a conscious failure to avoid the peril." *Thompson v. Bohlken*, 312 N.W.2d 501, 505 (Iowa 1981). We will focus on the second element. *See Whitacre v. Brown*, No. 11-0088, 2011 WL 4950183, at *4 (Iowa Ct. App. Oct. 19, 2011) (finding it necessary to address only one of the three elements).

The second element "is usually determinative because it is exceptionally difficult for plaintiffs to prove that a defendant had the requisite knowledge an injury was probable, rather than possible, under the circumstances." *Lancial v. Burrell*, No. 20-0136, 2020 WL 5650616, at *2 (Iowa Ct. App. Sept. 23, 2020). The element "requires more than a showing of the defendant's actual or constructive knowledge of the 'actuarial foreseeability—even certainty—that "accidents will happen."'" *Alden v. Genie Indus.*, 475 N.W.2d 1, 2 (Iowa 1991) (quoting *Henrich v. Lorenz*, 448 N.W.2d 327, 334 n.3 (Iowa 1989)). "To satisfy element two of the *Thompson*

test, the plaintiff must show not only the existence of a zone of imminent danger, but that the defendant knew or should have known that their conduct caused the plaintiff to be in that zone." *Id.* at 3.

Assuming without deciding there was a genuine issue of material fact as to whether the area immediately surrounding the auger was "a zone of imminent danger," we discern no genuine issue of material fact on the question of whether the defendants knew or should have known that their conduct on the date of the accident caused Oppedahl to be in that zone. The operative two words on that score are "their conduct." It is undisputed that none of the named defendants were at the job site when Oppedahl was injured and none had personal knowledge of the nature or circumstances surrounding the accident. Indeed, four of the five employees were far removed from the day-to-day activities of the drillers.

Kennerly was the director of the DOT's design bureau, previously referred to as the office of design. He was four levels above Oppedahl and attested that he "did not spend time in the field with those gathering soils samples" and "did not know [Oppedahl] personally." He summarized the history of accidents involving the auger system as follows:

> There had been an accident in 1997 involving [a] DOT employee . . . when he got too close to the auger while gathering soil samples. This was before my time in the Office of Design. There was also an accident in 2006 when an employee . . . reached into a running auger to clean it with his hands. Those two incidents resulted in fractures to my understanding. Going back almost three decades, I also understand there had been less serious incidents when employees reached into a running auger and became cut from a burr on the auger flights or injured a finger. Prior accidents involved employees reaching into augers by hand or obtaining soil samples too close to the rotating auger. I am aware of no accident with a rotating auger involving a driller who has remained at the controls

upon the operator's platform, as he or she should, during drilling operations.

Kennerly further attested that, of the over 900 average borings per year in the four calendar years preceding Oppedahl's accident, he was "aware of no injuries or accidents during that period with a rotating auger."

Nicholson worked in the survey and geotechnical side of the design bureau as assistant director of DOT's office of design. Kennerly was his immediate supervisor. Nicholson was three levels above Oppedahl, supervising Stanley, who supervised Chester, who supervised Oppedahl. Nicholson testified by deposition that he "didn't have a lot of regular day-to-day interaction with" the "work activities" of soils party crews.

Peters was the team leader for employee health and safety. He testified by deposition that he "wasn't familiar with" the truck-mounted auger operation until, at some point before the accident, he was asked to perform a "walk around" of the truck. He questioned Chester about whether safety guarding was needed around the auger and was told it would not work because employees "needed access to the auger either to clean off mud or add another section." Because Peters "didn't know enough" about the use of augers in this context, he did not "push the issue." In any event, he stated he had no authority to stop or modify the operation of the truck-mounted auger drill system. And he "had no supervisory authority over . . . Oppedahl." In his words, "I never gave Mr. Oppedahl any order or direction as to how he was supposed to go about operating the drill and auger system on" the date of the accident.

Stanley was the soils design engineer in the soils design section of the office of design. As noted, he supervised Chester. He attested that he "would have signed off on performance reviews of . . . Oppedahl which had been written by his supervisor, . . . Chester" but "[i]t was not a usual part of [his] work . . . to go out and be with the drillers when they were drilling." He did not personally train individual drillers. Like Peters, Stanley stated he "did not give Mr. Oppedahl any order or instruction regarding his operation of the drill unit on" the date of the accident.

Chester was the "soils party supervisor" and Oppedahl's immediate supervisor. He attested to "personally drill[ing] approximately 14,000 borings using equipment built and designed like the Mobile Drill B-47 model Mr. Oppedahl was using." That meant he

> ran drill rigs on many, many occasions without any auger guard or interlocking auger cage, without a maintain-contact switch which would shut the rig down if the operator took their hand off the control lever, without whisker switches around the unit and without any means to operate the drill by remote control.

He attested he "would not have put [himself] through such a risk if [he] thought an accident was probable." *See Henrich*, 448 N.W.2d at 333 ("We also think it significant that many of the defendants themselves had operated the butt skinner under the same conditions and with the same instructions Henrich complains of here. Had the defendants known that these conditions and instructions would probably result in injury to the butt skinner operator, we doubt that they would have endangered themselves or Henrich."); *Whitacre*, 2011 WL 4950183, at *4 ("[B]oth Hoffman and Peton had previously used and cleaned the machine using the same method as Whitacre. Had these defendants known this method would probably result in injury, we doubt they would have used it themselves."). Chester agreed

his opinion before the accident was that shielding would get in the way. He did not believe Oppedahl "was in any danger," given the eighteen-inch distance "to the edge of the platform from the center of the auger." In his words, "that auger is not going to reach over and grab him . . . as long as he's doing his job correctly." Although Oppedahl points to Chester's after-the-fact phone conversation in which he said he had been "expecting something like this for some time," it is worth reiterating that Chester did not know where Oppedahl was situated relative to the auger when the accident occurred. *See Williams v. Rice*, No. 07-1952, 2008 WL 3917543, at *4 (Iowa Ct. App. Aug. 27, 2008) ("[Plaintiff] does not contend that her co-employees instructed her to perform an unsafe function on the date of her accident."); *cf. Alden*, 475 N.W.2d at 3 (citing conflicting deposition testimony as to whether a co-employee instructed the injured worker to operate a man lift from the imminent zone of danger). Accordingly, Chester could not have known that his conduct caused Oppedahl to be in the zone of imminent danger. Without this knowledge component, Oppedahl could not establish the second element of the *Thompson* test as a matter of law.

We affirm the district court's grant of summary judgment in favor of the defendants.

**AFFIRMED.**