# In the Iowa Supreme Court

No. 24–0097

Submitted December 17, 2025—Filed February 6, 2026

**Brea Anne Griffith,** individually, as administrator of the **Estate of Michael Lee Griffith,** and on behalf of **L.M.G.,** a minor, and **Brian Griffith,**

Appellees,

vs.

**John L. Kulper** and **Travis J. Galloway,**

Appellants.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Benton County, Kevin McKeever, judge.

The defendants seek further review of a court of appeals decision that affirmed the judgment on a jury verdict awarding damages under co-employee gross negligence claims. **Decision of Court of Appeals Vacated; District Court Judgment Reversed and Case Remanded.**

Waterman, J., delivered the opinion of the court, in which all justices joined.

Matthew G. Novak (argued) and Bradley J. Kaspar of Pickens, Barnes & Abernathy, Cedar Rapids, for appellants.

John C. Wagner (argued), John Daufeldt, and Colin W. Smyka of John C. Wagner Law Offices, PC, Amana, for appellees Brea Anne Griffith, Estate of Michael Lee Griffith, and L.M.G.

Cory F. Gourley (argued) of Gourley, Rehkemper & Lindholm, PLC, West Des Moines, for appellee Brian Griffith.

**Waterman, Justice.**

Michael Griffith died on the job after falling through an open catwalk gate into machinery owned by his employer, Wendling Quarries. A post-accident inspection revealed that the pins required to secure the gate in a closed position were missing. Michael's wife, Brea, and his father, Brian, sued three of Michael's co-employees, alleging that they were grossly negligent and, therefore, liable under Iowa Code section 85.20(2) (2020). The case proceeded to trial, and the jury awarded $2.84 million. The defendants appealed the resulting judgment and the rulings denying their posttrial motions. The court of appeals affirmed the judgment, and we granted the defendants' application for further review.

On our review, we conclude that the co-employee gross negligence claims fail as a matter of law due to lack of evidence that these defendants had the requisite actual knowledge of the specific peril that caused Griffith's death—the missing pins to secure the gate. Accordingly, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand for dismissal of the action.

### I. Background Facts and Proceedings.

Wendling operates thirty-three quarries throughout Iowa and the Midwest. One of its quarries—located in the city of Garrison in Benton County, Iowa—processes limestone into lime. After the miners excavate the limestone, it passes through a series of crushers and conveyor belts before it is deposited into lime surge hoppers (pictured below):



Because Wendling's mining operations comprise numerous locations, much of its equipment is portable; lime surge hoppers are no exception. To move a hopper from one site to another, workers disassemble the bin, transport it to the new site, and then reassemble it, ensuring that all of the safety features are in place and operational.

Lime surge hoppers collect processed lime, holding it until dump trucks carry it away. But, because the lime particulate is so fine, it periodically accumulates around the rim of the hopper, preventing consistent flow onto the conveyor belt. To alleviate this problem, many hoppers are equipped with a vibratory motor that sends tremors through the bin, causing impacted lime to break free and flow onto the conveyor belt. Without such a mechanism, someone must periodically scrape the sides of the hopper, pushing the accreted lime into the funnel and onto the conveyor belt.

In early 2020, at Wendling's Garrison quarry, most of the lime surge hoppers were equipped with vibratory motors, meaning they needed little human intervention to address particulate buildup. But at least one hopper did not have a vibratory motor; therefore, it required periodic scraping.

To scrape the hopper, an employee would climb atop the machinery and stand on a catwalk that ran the perimeter of the bin. The catwalk was surrounded by a forty-two-inch-high metal railing. The railing itself had a gate, which could be opened for access to the hopper. The gate's design allowed it to be secured by metal linchpins. Once an employee was on the catwalk, the employee could lean over the railing and—using a long metal pole provided for the purpose—scrape accreted lime from the sides of the bin onto the conveyor belt below.

The inside of the lime surge hopper, because of its rapidly moving conveyor belts, the high volume of lime pouring into it, and the depth of the drop into its interior, is extremely dangerous. So, the person assembling the hopper must ensure that relevant safety mechanisms are in place, including appropriate retaining pins to secure the gate.

No one had been injured on the hopper since 1996, when a worker fell into the bin. The next year, Wendling installed guardrails around the catwalk to prevent similar accidents. The United States Mining Safety and Health Administration (MSHA) oversees surface mines. Once or twice a year, MSHA inspectors visited the quarry and viewed the lime surge hopper in operation. At no point during those inspections did that agency raise concerns about the configuration or operation of the hopper.

At Wendling, the responsibility both for assembling the lime surge hopper and for scraping the bin fell to the stockpilers. Stockpilers drive dump trucks

onto quarry sites, collect processed lime, and transport it to a stockpile. At the time of the accident, Wyatt Wilson and Drew Bixler were experienced stockpilers at the Garrison quarry. Griffith was a novice stockpiler.

Griffith began working for Wendling in May of 2019, when it bought out his previous employer, Coots Materials Company. Griffith initially worked in quality control at Wendling, then, in October, he received training to work as a miner. On December 30, he began working as a stockpiler at the Garrison quarry. During his first week at the Garrison quarry, Griffith's training spanned three days. On the first day, he rode along with an experienced stockpiler, who showed him the ins and outs of the job. On the second day, he drove a dump truck while an experienced stockpiler rode along. On the third and final day of his training, Griffith drove the truck on his own while an experienced stockpiler checked on him periodically.

On January 7, 2020, Wilson and Bixler were responsible for moving and reassembling the lime surge hopper. They testified that it was their job to ensure that the catwalk, railing, and gates were in the correct positions. Bixler had assembled hoppers eight to ten times in his five years of experience before Griffith's accident. Wilson, for his part, stated that although he could not remember the exact number, he and Bixler had assembled the hoppers together "[f]ive, 10 times or more."

Travis Galloway was Griffith's supervisor. He started with Wendling in 1997. Galloway had worked as a stockpiler and had scraped the hoppers many times. Galloway had been a crushing superintendent at the quarry since 2009. Galloway's duties included conducting weekly safety meetings and ensuring compliance with MSHA safety regulations. Galloway knew that no one had been injured on the hopper during the twenty-three years he worked there. No one

had raised any safety concerns about the hopper during Galloway's weekly safety meetings. MSHA had never cited the quarry for any regulatory violations related to the hopper. On the morning of January 8, Galloway "just briefly" visually inspected the newly repositioned hopper from ten to fifteen feet away by the glow of his headlights. He did not get out of his truck to climb onto the hopper to check the gate or its linchpins.

That afternoon, Wilson noticed that the bin of one of the lime surge hoppers was overflowing and that its conveyor belt was smoking. Wilson summoned help, and he and a coworker tried to get the hopper running again. Their efforts unavailing, they climbed onto the bin where they saw that Griffith had fallen into the hopper. Wilson noted at that time that the catwalk gate was in the lowered or open position.

Griffith had no pulse and his coworkers and emergency responders were unable to revive him with CPR. He was pronounced dead at the scene. The medical examiner later ruled that Griffith died of asphyxiation, apparently having fallen through the catwalk gate into the bin, where the lime buried him.

Wendling's President, Anthony Manatt, was not present at the Garrison quarry that day. Nor was John Kulper, Wendling's safety and environmental director, who was at his office in DeWitt. Kulper was not responsible for the day-to-day operations at the Garrison quarry.

Griffith's death shocked his coworkers. Wendling had used the lime surge hopper for decades without an accident, and many employees expressed their surprise and dismay that their coworker had fallen into the machine. Griffith's fellow stockpiler, Jerry Maylone, testified that Griffith's death was a "freak accident." Jonathan Cruise, another quarry employee with equipment maintenance duties, testified that he thought it was impossible for someone to

fall into the hopper. Bixler, a stockpiler, echoed Cruise's sentiment, stating: "I didn't think [falling into the bin] was possible." Similarly, Wilson, when asked, "[D]id you even think [falling into the hopper] was possible?" responded, "No."

Because Griffith's death occurred at a surface mine, MSHA investigated the accident. Ultimately, MSHA cited Wendling for multiple rule violations related to Griffith's death. It came to light that, on the day of the accident, the catwalk gate was secured not with the standard retaining pins but with a strip of metal wire, meaning that it was less secure than it could have been. Bixler testified that he had never seen the gate secured with wire and that he had never secured it with wire himself except when transporting the bin to a new site. Galloway, when asked if he would have prevented Griffith or any other worker from climbing the hopper had he known that an appropriate retaining pin was missing, stated, "[T]hat's correct." No one could explain how the wire wound up on the gate in place of the pins.

In July, Brea Griffith, Michael's widow, individually, as administrator of Griffith's estate, and on behalf of L.M.G. (Brea and Michael's daughter), sued Kulper, Galloway, and Manatt for gross negligence. Brian Griffith, Michael's father, also sued Kulper, Galloway, and Manatt for gross negligence. On the plaintiffs' motions, the district court consolidated the civil actions.

The case proceeded to an eight-day jury trial in April 2023. During his testimony, Kulper agreed that the inside of the lime surge hopper was "insanely" dangerous. Galloway agreed that "working around that open hopper" was inherently dangerous.

The plaintiffs produced evidence that: (1) the catwalk gate had been improperly secured; (2) there were remedial and preventative measures that could have saved Griffith's life, including, among other things, the installation of

a vibratory motor, the use of netting, the implementation of a lock out/tag out system, a requirement that employees wear safety harnesses with lanyards while working above the hoppers, or the installation of kill switches that would shut off the hoppers in case of an accident; and (3) quarry supervisors had performed minimal inspections of the machinery before beginning work. The district court admitted evidence of the MSHA citations issued to Wendling after the accident, over the defendants' objections that it constituted hearsay and was unduly prejudicial.

For their part, the defendants argued that Wendling had used the lime surge hopper for years and that the last time an employee had fallen into the bin was in 1996, before the forty-two-inch safety rails were installed. Kulper and Galloway both testified that they did not know that the catwalk gate was improperly secured or that the pins were missing. Galloway stated that his drive-by inspection of the hopper did not reveal that the gate was insecurely fastened or down, and Kulper was not at the Garrison quarry on the date of the accident and was not responsible for the assembly or day-to-day operation of the hopper.

At the close of evidence, the district court granted the defendants' motion for a directed verdict as to defendant Manatt[1] but denied similar motions pertaining to Kulper and Galloway. At the jury instruction conference, a dispute arose over the proper gross negligence marshaling instruction. The plaintiffs offered a uniform instruction produced by The Iowa State Bar Association and then proposed to supplement the uniform instruction with two additional definitions. The defendants objected to the instruction, arguing that it incorrectly stated the law because the uniform instruction focused on mere knowledge

---

[1]The plaintiffs have not appealed the ruling dismissing Manatt.

without explaining that co-employee gross negligence requires "actual knowledge." Ultimately, the district court gave the jury the following gross negligence instruction:

> Gross negligence of a co-employee, as used in Instruction Numbers 10 and 11, exists when the co-employee has (1) knowledge of the danger to be apprehended; (2) knowledge that injury is a probable, as opposed to a possible, result of the danger; and (3) a conscious failure to avoid the danger. The Plaintiffs must prove all three elements of gross negligence in order to recover damages.

> "Probable" in this context is that which seems reasonably to be expected: so far as fairly convincing evidence or indications go.

> "Possible" is simply that which happens so infrequently that it is not expected to happen again under similar circumstances.

The jury returned a verdict awarding about $2.6 million to Brea, Griffith's estate, and L.M.G., and $200,000 for Brian. The district court denied the defendants' motions for judgment notwithstanding the verdict (JNOV) or new trial.

The defendants appealed, arguing that the district court erred in four ways: (1) by denying the defendants' JNOV motion despite the fact that Kulper and Galloway lacked "actual knowledge" of the peril, (2) by giving an improper jury instruction on gross negligence, (3) by admitting evidence of the MSHA citations issued to Wendling, and (4) by allowing a physician's assistant and a therapist, both of whom were treating Brea, to testify as undisclosed expert witnesses. We transferred the case to the court of appeals.

The court of appeals affirmed the district court's judgment on the jury verdict, holding that the evidence supported a finding of gross negligence. The court found that the "circumstances of an unsecured gate, missing pins, no warnings, missing supervision, and a mere pre-dawn visual inspection by headlights of the newly-reassembled hopper conducted from a distance on the day of Michael's death made the injury probable." The court of appeals relied in

part on the defendants' constructive knowledge, or what they should have known or discovered. The defendants applied for further review, which we granted.

The defendants argue that the court of appeals erred by concluding that sufficient evidence supported a finding of co-employee gross negligence. The defendants take special issue with the court of appeals' handling of our precedents' actual knowledge requirement; in their view, the court of appeals failed to consider the undisputed testimony that neither Kulper nor Galloway had actual knowledge of the missing gate pins. The court of appeals, the defendants argue, thereby injected an element of constructive knowledge into the co-employee gross negligence analysis, an element that our precedent explicitly disclaimed. Because we resolve this appeal on that ground, we do not address the other grounds for reversal raised by the defendants.

**II. Standard of Review.**

"We review a district court's ruling on a motion for judgment notwithstanding the verdict for errors at law." *Smith v. Iowa State Univ. of Sci. & Tech.*, 851 N.W.2d 1, 18 (Iowa 2014). We must decide "whether there was sufficient evidence to justify submitting the case to the jury when viewing the evidence in the light most favorable to the nonmoving party," *id.* (quoting *Van Sickle Constr. Co. v. Wachovia Com. Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010)), which means substantial evidence to support "each element of the plaintiff's claim," *id.* "[E]vidence is substantial if 'reasonable minds would accept the evidence as adequate to reach the same findings.' " *Id.* (quoting *Doe v. Cent. Iowa Health Sys.*, 766 N.W.2d 787, 790 (Iowa 2009)).

**III. Analysis.**

For want of linchpins, a life was lost. By all accounts, Griffith fell to his death through an open, unsecured gate. The missing pins would have secured

the gate in a closed position. A proper inspection presumably would have discovered that the pins were missing and that the gate was inadequately secured. Griffith's fatal accident was preventable. But the plaintiffs must clear a high bar to recover against Griffith's co-employees for his on-the-job accident. More than proof of ordinary negligence is required. To recover tort damages beyond the workers' compensation system's death benefits, the plaintiffs had to prove Galloway or Kulper actually knew that the pins were missing and that the gate was unsecured. Constructive knowledge, meaning proof that they *should* have known of this peril, is not enough.

Kulper and Galloway testified that they did not know the pins were missing and did not know the gate was unsecured. Their testimony was unrebutted. The failure of proof is fatal to the plaintiffs' case. The court of appeals impermissibly lowered the bar to allow a recovery for gross negligence on this record.

We begin with an overview of liability for workplace accidents. Iowa Code chapter 85, the Iowa Workers' Compensation Act, is "an injured worker's exclusive remedy against an employer or coemployee." *Walker v. Mlakar*, 489 N.W.2d 401, 403 (Iowa 1992) (en banc). The workers' compensation system rests on the policy judgment "that the disability of a work[er] resulting from an injury arising out of and in the course of his [or her] employment is a loss that should be borne by the industry itself . . . and not suffered alone by the work[er] or the employer." *Baker v. Bridgestone/Firestone*, 872 N.W.2d 672, 676 (Iowa 2015) (alterations and omission in original) (quoting *Tunnicliff v. Bettendorf*, 214 N.W. 516, 517–18 (Iowa 1927)). "In the grand bargain removing workers' compensation matters from the civil justice system, employers receive immunity from potentially large tort lawsuits and jury verdicts on the condition that they

pay compensation benefits for injuries arising out of and in the course of employment without regard to fault." *Id.* at 676–77.

Iowa Code section 85.20 extends this statutory immunity from common law tort liability to co-employees of the injured worker, with a narrow exception for those who are grossly negligent. *See McGill v. Fish*, 790 N.W.2d 113, 119 (Iowa 2010); *Walker*, 489 N.W.2d at 403 ("Although an employer is always immune from common law tort liability, an injured worker may maintain a common law tort action against a coemployee to recover for injuries *only* if the employee can establish that his or her injuries were caused by the coemployee's 'gross negligence amounting to such lack of care as to amount to wanton neglect for the safety of another.' "). "In sum, section 85.20 makes workers' compensation the employee's exclusive remedy for any work-related injury as against their employer or co-employees, except for gross negligence claims against co-employees." *Montague v. Skinner*, ___ N.W.3d ___, ___, 2026 WL 70667, at *4 (Iowa Jan. 9, 2026).

"Allegations of gross negligence also carry a high burden of proof." *Johnson v. Interstate Power Co.*, 481 N.W.2d 310, 321 (Iowa 1992) (en banc). Proof of ordinary negligence is not enough; plaintiffs must prove "three elements necessary to establish a coemployee's 'gross negligence' under Iowa Code section 85.20: (1) knowledge of the peril to be apprehended; (2) knowledge that injury is a probable, as opposed to a possible, result of the danger; and (3) a conscious failure to avoid the peril." *Walker*, 489 N.W.2d at 403. The plaintiffs must prove all three elements to recover. *Id.* The "peril to be apprehended" is the "peril which caused" the worker's injury. *Id.* at 404.

In *Walker v. Mlakar*, we squarely rejected the argument that "a coemployee's mere *constructive* knowledge of a condition may constitute

'knowledge of the peril to be apprehended.' " *Id.* at 404 (citing *Thompson v. Bohlken*, 312 N.W.2d 501, 504–05 (Iowa 1981) (en banc)). We made clear that *actual* knowledge of the peril is required under the first and third elements:

> This is because to allow an employee's mere constructive knowledge of a hazard to satisfy the first element of *Thompson* [*v. Bohlken*] would be to eviscerate the requirement under the third element that the coemployee must also "consciously fail to avoid the peril" in order to be found grossly negligent. In other words, it is theoretically and factually impossible for an employee to "consciously fail to avoid" a peril if the employee did not actually know of it, i.e., one cannot "consciously fail to avoid" a peril of which one only "should have been aware."

> To require a coemployee to have actual knowledge of a hazard before exposing him or her to tort liability is more consistent with the plain language of section 85.20.

*Id.* at 405.

We recently reiterated "that knowledge of the peril requires that the defendant 'actually knew' of the peril or hazard. Constructive knowledge of the peril is insufficient to establish gross negligence." *Mehmedovic v. Tyson Foods, Inc.*, 21 N.W.3d 412, 424 (Iowa 2025) (citation omitted) (quoting *Walker*, 489 N.W.2d at 404).

To satisfy the legal standard, the plaintiffs had to prove that Galloway and Kulper actually knew of the peril—the missing linchpins that left the gate unsecured. The plaintiffs lacked even a scintilla of evidence on that dispositive element. The district court erred by denying their motions for a directed verdict.

We have repeatedly enforced the actual knowledge requirement. In *Taylor v. Peck*, Taylor was injured by a machine whose safety features had been disabled. 382 N.W.2d 123, 128 (Iowa 1986). Taylor's direct supervisor was aware of the modifications to the machine, but there was no evidence that the general

manager of the plant, Peck, knew that the safety features had been disabled. *Id.* Affirming the district court's ruling for JNOV, we wrote:

> In this case, there had not been any previous accidents on the Brown-Boggs press, nor had any safety inspections alerted Peck of any danger or malfunction concerning activation of the machine. There is no evidence that Peck knew the left palm operating button was weighted down at any material time. Further, defendant Peck did not instruct Betty to put her hand into the die. At trial, Peck was asked by plaintiffs' counsel whether the probability of injury was greater when a person put his or her hand into the die than it was when a person did not do so. Peck responded affirmatively to this question. However, there was no evidence that Peck knew this result was probable as opposed to possible, when the machine was stopped or not operating, or the palm press buttons were not both being depressed or activated.

*Id.* (emphasis omitted). Peck simply did not have actual knowledge of the specific peril facing Taylor. *Id.*

In *Henrich v. Lorenz*, we reversed a judgment on a jury award for a worker's hand injury at a meatpacking plant. 448 N.W.2d 327, 332–35 (Iowa 1989) (en banc). We held that Henrich failed to prove that the defendants had actual knowledge of the specific hazard that caused her injury. *Id.* at 335. We stated, "[T]he record shows that the coemployee-defendants had no knowledge that the combination of conditions under which Henrich worked would probably result in injury to a butt skinner operator." *Id.* at 334. We also relied on the "low historical incidence of injuries on the butt skinner." *Id.*

In *Johnson v. Interstate Power Co.*, we affirmed the district court's order granting a directed verdict on a co-employee gross negligence claim. 481 N.W.2d at 321–22. We pointed out that:

> There was no evidence to suggest that [the defendant] knew there was a metal pole near the doghouse or that [the plaintiff] would use it. Nor was there any evidence that employees had ever used a ten foot metal pole to unclog the jetsploder. Nor was there any evidence that [the defendant] had instructed [the plaintiff] to use

one. Finally, there was no evidence that a similar accident had ever occurred at the mill.

*Id.* at 321. Without the co-employee's actual knowledge of the specific peril that injured the employee, the gross negligence claims failed as a matter of law.

Similarly, in *Walker*, we affirmed the district court's directed verdict because the plaintiff's estate failed to produce a "scintilla" of evidence that the defendants knew that there was a precipitous drop-off beneath the aluminum mill. 489 N.W.2d at 404. We recognized that some worksite conditions are inherently dangerous, yet we determined that actual and specific knowledge of the peril to be apprehended is required for recovery on a co-employee gross negligence claim.

On the other side of the ledger, in *Swanson v. McGraw,* we reversed the district court's order granting a directed verdict. 447 N.W.2d 541, 545 (Iowa 1989) (en banc). Because Swanson warned his supervisors that there was a hole in his protective rain suit and because the supervisors knew that the caustic soap that Swanson used to clean machinery could seep into the suit causing severe burns, we concluded that "there was substantial evidence on all three elements of gross negligence." *Id.* Again, the evidence showed that the defendants' actually knew of the specific peril that harmed the employee. *Id.*

In *Alden v. Genie Industries*, Alden was fatally injured in a work-related accident when a manlift collapsed in high winds. 475 N.W.2d 1, 1 (Iowa 1991). On the day before the fatal accident, Alden and a coworker, Gibbs, used the manlift to paint flag poles:

> Although the manlift was equipped with outriggers to provide stability, the outriggers could not be extended since the manlift was being operated from the bed of a pickup truck. The extra height provided by placing the manlift in the bed of the truck was apparently necessary to reach the top of the flagpoles.

*Id.* The next day, their supervisor told them to continue the painting project. *Id.* Gibbs objected "on the ground that it was too windy to safely use the manlift." *Id.* The supervisor responded, "[S]ee if you can finish the job." *Id.* Alden and Gibbs resumed using the manlift from the pickup bed without outriggers. *Id.* Alden was killed when the lift collapsed. *Id.* at 1–2. The supervisor denied telling them to operate the manlift without outriggers. *Id.* at 2. Alden's wife sued the supervisor for gross negligence, and the district court granted his motion for summary judgment. *Id.* at 1. We reversed, finding questions of fact precluded summary judgment. *Id.* at 3. The supervisor's actual knowledge of the peril was shown by his own deposition testimony, where he "freely admit[ted] that the operation of the manlift from the bed of the pickup without outriggers was unsafe, even on a windless day." *Id.* Fact questions as to whether the supervisor ordered Alden to proceed without outriggers precluded summary judgment. *Id.*

*Alden* is consistent with our other precedent. In discussing the second element (knowledge that injury was probable as opposed to merely possible), we referred to "constructive knowledge" that the supervisor "knew or should have known that his conduct placed the plaintiff in a zone of imminent danger." *Id.* at 2. The court of appeals here quoted and relied on *Alden*'s discussion of constructive knowledge in affirming the judgment against Kulper and Galloway, concluding they "should have known" of the missing pins had Galloway conducted a proper inspection. (Quoting *id.*) In doing so, the court of appeals took *Alden*'s discussion of constructive knowledge out of context.

At the second element, we do not require a defendant to have actual knowledge that the conduct will in fact result in injury to a coworker, only that the conduct is likely to do so. It is in this context of contrasting probable with merely possible resulting injury that we said in *Alden* that the second *Thompson*

element would be satisfied if a defendant "knew or should have known that his conduct placed the plaintiff in a zone of imminent danger." *Alden,* 475 N.W.2d at 2; *see also Taylor,* 382 N.W.2d at 127 (explaining that the plaintiff in *Thompson* failed at the second element because there was "insufficient evidence to show that defendant knew, or should have known, that such an accident was probable because no other accidents had occurred on the same press under similar circumstances"). Yet, we went on in *Alden* to explain that "[u]nless the defendants [are shown to have known] that their conduct would place their coemployees in imminent danger, so that someone would probably—more likely than not—be injured because of the conduct, then the knowledge does not satisfy the essential elements of a section 85.20 gross negligence action." 475 N.W.2d at 2 (second alteration in original) (quoting *Henrich,* 448 N.W.2d at 334 n.3). Thus, we still required evidence that the defendant had actual knowledge of the specific peril that made injury probable and not just possible.

Lest there be any doubt, the very next year after *Alden,* our court, sitting en banc, made clear in *Walker* that actual knowledge of the peril must still be shown to satisfy the first and third elements: "[T]o allow an employee's mere constructive knowledge of a hazard to satisfy the first element of *Thompson* would be to eviscerate the requirement under the third element that the coemployee must also 'consciously fail to avoid the peril' in order to be found grossly negligent." *Walker,* 489 N.W.2d at 405. Walker is the controlling precedent on the actual knowledge requirement, and constructive knowledge of the specific peril is insufficient. The court of appeals misread *Alden* to allow otherwise.

The court of appeals decision conflicts with our precedent requiring actual knowledge of the specific peril causing the injury. This case closely resembles

*Walker*. Both in *Walker* and here, the co-employees knew of the general danger of the worksite, but they did not have actual knowledge of the specific peril to be apprehended. *See id.* at 404. In *Walker,* the co-employee defendants had elaborate safety protocols in place to protect against the dangers of working in and around aluminum mills. *Id.* at 403. But neither co-employee–defendant actually knew about the unguarded drop-off beneath the mill. *Id.* at 404.

As in *Walker*, just so here. Kulper and Galloway were aware of the general risks associated with surface mining and with the lime surge hopper. But the general jeopardy posed by the hopper's operation was not the basis of the gross negligence. After all, the hopper had been in use for decades without incident. Instead, the specific peril to be apprehended was that, without the appropriate retaining pins, the catwalk gate could swing open, causing a worker to fall into the hopper. But there is no evidence that either Kulper or Galloway were aware of the missing pins.

Galloway admitted that on the morning of the incident he performed only a cursory inspection: he drove his car alongside the bin and peered at it through the glow of his headlights. He did not climb up the hopper. He did not check the catwalk. He did not confirm that the pins were in place on the gate. A jury could easily find that his cursory inspection was negligent, but without proof that Galloway actually knew of the missing pins, the gross negligence claim against him fails.

The plaintiffs' gross negligence claims against Kulper are even more attenuated. He was not present at the Garrison quarry on the day of the accident, and there is not a scintilla of evidence that he knew of the missing pins or unsecured gate. Even if he could be found negligent for lax oversight as the safety and environmental director, Iowa's workers' compensation statute provides the

exclusive remedy for injuries or death resulting from ordinary negligence. *Walker*, 489 N.W.2d at 406.

The plaintiffs, district court, and court of appeals relied on Galloway's cursory inspection and his failure to go up on the catwalk to inspect the gate that morning as proof of gross negligence. But they cite no case where we held that a failure to inspect safety equipment was by itself sufficient to prove gross negligence. To the contrary, our precedent requires actual knowledge of the peril, not merely a failure to inspect that would have led to the peril's discovery. *See Peck*, 382 N.W.2d at 124, 128 (affirming JNOV for co-employee plant manager who walked by the plaintiff as she operated the punch press the morning of her accident while he was unaware from any inspection that the safety switch had been disabled). We do not impute to co-employees the knowledge they would have gained from an inspection. *See id.* at 128.

The plaintiffs also rely on evidence that the accident could have been avoided if Wendling had used a vibratory motor, safety netting, a lock out/tag out system, kill switches, or safety harnesses and lanyards. Yet even without those measures, miners had used the lime surge hopper without incident since Galloway's employment began in 1997. The only prior accident involving a fall into the hopper occurred in 1996, before the safety rails were installed. The absence of those safety measures falls short of proving gross negligence, given the absence of other injuries on the hopper during those twenty-three years. *See Johnson*, 481 N.W.2d at 321 (relying on absence of similar accidents); *Peck*, 382 N.W.2d 123 at 128 (same).

The unsecured gate with missing pins was the peril that the defendants failed to apprehend. Without evidence that Galloway or Kulper actually knew that the pins were missing and that the gate was unsecured, dismissal of the

gross negligence claims is required. The district court erred by denying the defendants' motions for directed verdict or JNOV. Because we resolve the appeal on this ground, we do not reach the defendants' other arguments for reversal.

**IV. Conclusion.**

For the foregoing reasons, we vacate the decision of the court of appeals and reverse the district court judgment. We remand the case for entry of an order dismissing this civil action with prejudice. On this trial record, the death benefits provided under Iowa's workers' compensation statute are the plaintiffs' exclusive remedy for Griffith's fatal on-the-job accident.

**Decision of Court of Appeals Vacated; District Court Judgment Reversed and Case Remanded.**